No. 2--05--1218                                        filed: 12/29/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| ROBERT KARAS, as Father and Next Friend of Benjamin S. Karas, a Minor, | ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 04--L--164 |
| | ) | |
| JOSEPH STREVELL, RUSSELL ZIMMERMAN, NAPERVILLE CENTRAL REDHAWK HOCKEY ASSOCIATION, AMATEUR HOCKEY ASSOCIATION OF ILLINOIS, INC., and ILLINOIS HOCKEY OFFICIALS ASSOCIATION, INC., | ) ) ) ) ) ) | |
| | ) | Honorable |
| | ) | John T. Elsner, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Robert Karas (on behalf of his minor son, Benjamin Karas), appeals the trial court's dismissal, pursuant to section 2--615 of the Code of Civil Procedure (Code) (735 ILCS 5/2--615 (West 2004)), of his complaint, seeking recovery for an injury to his son, against defendants, Joseph Strevell, Russell Zimmerman, Naperville Central Redhawk Hockey Association (NCRHA), Amateur Hockey Association of Illinois, Inc. (AHAI), and Illinois Hockey Officials Association, Inc. (IHOA).

Plaintiff filed his second amended complaint against defendants on September 14, 2004, and we draw the facts of the case from the allegations stated therein. On January 25, 2004, Benjamin played in an organized hockey contest against NCRHA's junior varsity hockey team, which included

defendants Strevell and Zimmerman. NCRHA was a member of AHAI, which promulgated and disseminated hockey contest rules, including a prohibition against checking from behind. At all times relevant to the complaint, the backs of all game jerseys for players on both teams had sewn above or between the players' numbers "the warning 'STOP' to reinforce the prohibition" against checking from behind. During the January 25 contest, Strevell and Zimmerman checked Benjamin from behind while he was near the boards that formed the wall of the playing rink and while he was partially bent over and looking down with his head pointing toward the boards. The collision caused Benjamin's head to strike the boards and resulted in his serious injury.

During the relevant time period, NCRHA was responsible for coaching and teaching its players to abide by all hockey contest rules. On and before January 25, NCRHA failed to instruct its players to refrain from checking from behind and failed to discipline or sanction players who were known to check from behind. AHAI failed to instruct its member teams to prevent its players from checking opposing players from behind, failed to instruct officials to strictly enforce the prohibition against checking from behind, and failed to discipline or sanction players and teams known to engage in checking from behind. AHAI also failed to discipline, sanction, or control IHOA's "known and repeated" failures to enforce strictly the prohibition against checking from behind. Likewise, IHOA failed to instruct its member officials to strictly enforce the prohibition against checking from behind and failed to discipline or sanction officials for their known failure to strictly enforce the prohibition against checking from behind.

The first count of plaintiff's second amended complaint sought damages against Strevell and Zimmerman for willful and wanton conduct causing Benjamin's injury. Counts II, IV, and VI sought damages against NCRHA, AHAI, and IHOA for their negligence in connection with Benjamin's

injury. Counts III, V, and VII sought damages against NCRHA, AHAI, and IHOA for their willful and wanton conduct leading to Benjamin's injury. Count VIII of the second amended complaint alleged a civil conspiracy between AHAI and IHOA that led to Benjamin's injury.

Defendants filed motions to dismiss pursuant to section 2--615 of the Code, and the trial court dismissed the first count on March 14, 2005, and dismissed counts II through VII on July 1, 2005. The trial court granted plaintiff leave to replead count VIII to allege civil conspiracy with more specificity, and plaintiff thereafter filed a third amended complaint, which amended the final count and listed each of the dismissed counts with a statement that each had been dismissed. The third amended complaint charged civil conspiracy as follows, in pertinent part:

"12. Prior to January 25, 2004, [AHAI] had made changes to its 'checking from behind rule' as a result of severe injuries sustained by *** players ***. Materially, the rule was changed such that the penalty for an infraction of the rule was increased to an ejection of the violating player and a 3 game suspension.

13. Prior to January 25, 200[4], but after the aforementioned change of the rule, [IHOA] willfully failed to call the checking from behind penalty during AHAI sanctioned hockey contests on more than one occasion because [IHOA] *** believed *** that the resultant penalty as set forth in the modified rule was too harsh.

14. Thereafter, but prior to January 25, 2004, because [IHOA] willfully refused to call players for violating the checking from behind rule on more than one occasion, [AHAI] agreed to reduce the penalty *** ostensibly in order to promote [IHOA] to call all violations of the rule.

* * *

-3-

16. On and before January 25, 2004, [AHAI and IHOA] *** agreed to not enforce the aforesaid checking from behind rule during games that occurred under the authority of the rule of [AHAI]."

On November 7, 2005, the trial court dismissed the final count of plaintiff's complaint. Plaintiff timely appeals.

A section 2--615 motion to dismiss attacks the legal sufficiency of the complaint. Willmschen v. Trinity Lakes Improvement Ass'n, 362 Ill. App. 3d 546, 549 (2005). Illinois is a fact-pleading jurisdiction that requires a plaintiff to present a legally and factually sufficient complaint, and the plaintiff must allege sufficient facts to state all of the elements of the asserted cause of action. Purmal v. Robert N. Wadington & Associates, 354 Ill. App. 3d 715, 720 (2004). Thus, "[t]he question to be decided when ruling on a section 2--615 motion to dismiss is whether the plaintiff has alleged sufficient facts which, if proved, would entitle the plaintiff to relief." Doe v. Chicago Board of Education, 339 Ill. App. 3d 848, 853 (2003). "In reviewing the sufficiency of the complaint, the court must accept as true all well-pleaded facts in the complaint and all reasonable inferences that can be drawn from those facts." Willmschen, 362 Ill. App. 3d at 549. "However, conclusions of law and conclusory factual allegations not supported by allegations of specific facts are not deemed admitted." Purmal, 354 Ill. App. 3d at 720. The sufficiency of a complaint presents a question of law, which receives de novo review. Doe, 339 Ill. App. 3d at 853. Because all of plaintiff's arguments challenge only the trial court's conclusions that each of the counts of his complaint was legally insufficient, our review of all issues in this case is de novo.

Plaintiff first argues that the trial court erred in dismissing the first count of his complaint, because he alleged sufficient facts to state a cause of action against Strevell and Zimmerman. We agree.

There is no separate tort of willful and wanton conduct. Ziarko v. Soo Line R.R. Co., 161 Ill. 2d 267, 274 (1994). Normally, a person owes a duty of ordinary care to guard against injuries to others that may result as a reasonably probable and foreseeable consequence of negligent conduct. Pfister v. Shusta, 167 Ill. 2d 417, 420 (1995). A claim sounding in negligence thus arises where a plaintiff alleges "the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach." Ward v. K mart Corp., 136 Ill. 2d 132, 140 (1990). However, under a judicially created exception to the standard of ordinary care, voluntary participants in contact sports are not liable for injuries caused by simple negligent conduct. Pfister, 167 Ill. 2d at 420 (reaffirming holdings of previous appellate court cases creating and applying the rule). Instead, they owe each other a duty to refrain only from willful and wanton or intentional misconduct, and they are liable for injuries resulting from a breach of that limited duty. Pfister, 167 Ill. 2d at 420-21.[1]

---

[1]The supreme court rejected another suggested approach that would focus on the scope of physical contact allowed by the rules and usages in the game, instead adopting the contact sports exception, which requires willful and wanton conduct in order to sustain liability. The supreme court reasoned that, even in games where there are rules to govern the permissible degree of physical contact among participants, "it is difficult to determine what may be an acceptable amount of physical contact," and " 'rule infractions, deliberate or intentional, are virtually inevitable.' " Pfister, 167 Ill. 2d at 424, quoting Oswald v. Township High School District No. 214, 84 Ill. App. 3d 723, 727 (1980). Thus, the contact sports exception "offer[ed] a practical approach" to the problem. Pfister,

The label of willful and wanton conduct has developed in Illinois to describe a hybrid between acts considered negligent and behavior found to be intentionally tortious. Ziarko, 161 Ill. 2d at 275. Willful and wanton conduct includes acts performed intentionally, but, unlike intentionally tortious behavior, willful and wanton conduct may also be proven where the acts have been less than intentional. Ziarko, 161 Ill. 2d at 274. At the other end of the continuum between intentional and negligent conduct, it has been acknowledged that willful and wanton conduct shares some characteristics with negligent conduct and that there is a "thin line" between simple negligence and willful and wanton acts. Ziarko, 161 Ill. 2d at 275, citing Burke v. 12 Rothschild's Liquor Mart, Inc., 148 Ill. 2d 429, 451 (1992), and Mattyasovszky v. West Towns Bus Co., 61 Ill. 2d 31, 35 (1975). Thus, willful and wanton conduct " 'is generally considered in that area of fault between ordinary negligence and actual malice.' " Ziarko, 161 Ill. 2d at 275, quoting Myers v. Krajefska, 8 Ill. 2d 322, 329 (1956). In view of the fact that willful and wanton conduct is a matter of degree, "a hard and thin line definition [of the term] should not be attempted." Myers, 8 Ill. 2d at 329.

Willful and wanton conduct may be found where an act was done with intent or "with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." Myers, 8 Ill. 2d at 329. Put another way, as it is now commonly stated, to plead a cause of action that requires an allegation of willful and wanton conduct, a plaintiff must allege that the defendant held either an "intention to harm" or "an utter indifference to or conscious disregard for [his] welfare" (e.g., Doe v. Chicago Board of Education, 213 Ill. 2d 19, 28 (2004); Adkins v. Sarah Bush Lincoln Health Center, 129 Ill. 2d 497, 518 (1989)) and that he suffered an injury as a result of that willful and wanton conduct.

---

167 Ill. 2d at 425.

Whether willful and wanton conduct has been committed in any given case requires close scrutiny of the facts as disclosed by the evidence. O'Brien v. Township High School District 214, 83 Ill. 2d 462, 469 (1980), citing Lynch v. Board of Education, 82 Ill. 2d 415, 430 (1980), quoting Myers, 8 Ill. 2d at 329. However, in ruling on a section 2--615 motion, a court must first decide as a matter of law whether a plaintiff has alleged sufficient facts such that a jury question is created concerning the willful and wanton nature of the defendant's conduct. Doe v. Calumet City, 161 Ill. 2d 374, 390 (1994), overruled on other grounds, In re Chicago Flood Litigation, 176 Ill. 2d 179 (1997). That said, our supreme court has noted that, given the "necessity to closely scrutinize the facts of each case, [a] plaintiff should be allowed to present evidence in support of his allegations of willful and wanton misconduct." O'Brien, 83 Ill. 2d at 469. Thus, though a complaint alleging willful and wanton conduct should be dismissed where it does not state sufficient facts to meet the standard, given the factual and amorphous nature of the definition of the term, courts should dismiss such complaints sparingly in order to effect the policy of determining the presence of willfulness and wantonness based on the evidence and not the pleadings.

Before addressing whether plaintiff's allegations met the above standard, we must first clarify precisely what plaintiff alleged. All the defendants at various points in their briefs and at oral argument oversimplify plaintiff's allegations by characterizing the alleged actions as merely "checking," "checking from behind," or simple rule violations. For example, Zimmerman states that "plaintiff alleges that [Benjamin] was injured when he was checked from behind during a hockey game." He points out that actions "within the participants' ordinary expectations, such as 'checking in hockey,' cannot sustain a cause of action" and that "routine rule violations are common occurrences during game play." Strevell states, "the trial court found that checking from behind was a recognized

risk by ice hockey participants" and that "[p]laintiff argued to the trial court that committing a recognized penalty in a hockey game met the standard for willful and wanton conduct." Likewise, the remaining defendants argue that it should not "be the public policy of this State to allow contact sports participants to file individual lawsuits against their opponents simply on a theory that they suffered injury as a result of a violation of the rules of the sport." However, plaintiff has alleged more. Plaintiff alleged not only that Strevell and Zimmerman checked Benjamin from behind in violation of the rules, but also that they did so while he was bent over next to the boards, with his head pointing toward the boards, and that they did so despite the fact that a "STOP" warning was displayed on the back of every player's jersey.

Strevell and Zimmerman rely on their mischaracterizations of plaintiff's allegations for one of their primary arguments in favor of affirmance: allowing plaintiff's complaint to move forward would expose sports participants to liability in any instance in which their negligent violation of the rules (by committing a foul or a penalty) causes injury. This argument, which the player defendants recite repeatedly throughout their briefs, is a distraction from the real issue. Plaintiff does not allege a mere rules violation, and, indeed, plaintiff agrees that imposing liability for negligent rules violations in sporting contests would be absurd. Instead, plaintiff alleges that Strevell's and Zimmerman's actions were not only violations of the rules, but, given Benjamin's vulnerable position and the "STOP" warnings on players' jerseys, that they went beyond conduct ordinarily accepted during the course of competition and into willful and wanton conduct. When the player defendants argue that plaintiff's position would result in liability for negligence during the course of play, they presuppose that plaintiff has not alleged willful and wanton conduct. Thus, the player defendants' argument overlooks the essential question here. For that reason, we reject as hyperbolic slippery-slope rhetoric the player

defendants' protestations that allowing plaintiff's complaint to go forward will allow "every hockey participant who [is] injured during a game when a penalty [is] committed [to] sue another player for injuries," and we move to consider whether plaintiff has alleged willful and wanton conduct.

We conclude that the factual allegations above meet the requirements for pleading a cause of action based on willful and wanton conduct. Plaintiff alleged not only that Strevell and Zimmerman broke the rules of hockey, but that they broke a rule of such special emphasis that players' jerseys were altered to reinforce it. Plaintiff also alleged circumstances surrounding Strevell's and Zimmerman's actions--they allegedly checked Benjamin when he was defenseless and in a position of acute vulnerability--that evince a conscious disregard for his safety. These allegations taken as true create an inference that Strevell's and Zimmerman's actions exceeded those acceptable during the excitement of play and were so reckless that they were likely to cause, and indeed did cause, injury to another. Therefore, we conclude that the first count of plaintiff's complaint should be reinstated so that he has an opportunity to prove the truth of the allegations.

That said, the complaint notably does not say where the hockey puck was at the time the player defendants struck Benjamin. The location of the puck and, perhaps relatedly, what Benjamin and the player defendants were attempting to do at the moment of impact are all matters yet to be fleshed out by evidence, and those matters might well be relevant to Strevell's and Zimmerman's states of mind at the time they struck Benjamin. It is quite possible that, once all the circumstances surrounding this incident are revealed, the inference of willful and wanton conduct will disappear. However, on the bare facts pled here, we can, and therefore must, infer willful and wanton conduct.

In reaching our conclusion, we reject several arguments from the player defendants. Zimmerman argues that Illinois law recognizes a margin of error for conduct occurring during the

excitement of play, and that, given the physical nature of hockey in particular (see McKichan v. St. Louis Hockey Club, L.P., 967 S.W.2d 209, 212-13 (Mo. App. 1998)), Zimmerman's and Strevell's conduct should be considered leniently. Zimmerman contends that, though the player defendants' conduct might be considered tortious in most other contexts, "such conduct is widely accepted, and, in fact, encouraged" in the sport of hockey. We note that plaintiff's allegation that the player defendants' conduct violated the rules belies Zimmerman's assertion that such conduct is openly "encouraged." However, wording aside, the gravamen of Zimmerman's argument is that, in the excitement of play, "[i]n order to gain possession of the puck or slow down the progress of opponents, hockey players routinely hit each other with body checks or slash at each other with their sticks."

We agree with Zimmerman that Illinois law recognizes an increased margin of error for conduct undertaken in the excitement of play in a contact sport. For example, in Pfister, four college students improvised opposing goals against the walls of a dormitory lobby and began a spontaneous game of kicking an aluminum soda can toward the opposing team's goal. Pfister, 167 Ill. 2d at 419. During the game, the plaintiff allegedly pushed the defendant toward a wall in an attempt to gain control of the can, and the defendant allegedly responded by pushing the plaintiff and causing him to fall. Pfister, 167 Ill. 2d at 419. While attempting to break his fall, the plaintiff put his left hand and forearm through the glass door of a wall fire extinguisher case and sustained injuries to his hand and forearm. Pfister, 167 Ill. 2d at 419. The trial court granted the defendant's motion for summary judgment on the grounds that the activity at issue fell within the contact sports exception to the ordinary duty of care and that the plaintiff had not alleged willful and wanton conduct. Pfister, 167 Ill. 2d at 420. The supreme court affirmed the trial court, because the plaintiff did not allege, and the

facts did not establish, either willful and wanton or intentional misconduct by the defendant. Pfister, 167 Ill. 2d at 420.

We also agree with Zimmerman that conduct may violate the rules of competition but nevertheless be generally accepted by the relevant community, and we agree that, if the conduct is generally accepted, it should not form the basis for liability. Indeed, if the conduct were generally accepted, it would fall within the scope of the contact sports exception (i.e., it would amount to acceptable negligence or would breach no duty at all), which, as discussed more fully below, is partially based on the idea that participants consent to the risks associated with the competition they enter. See Pfister, 167 Ill. 2d at 425 ("Participants in team sports *** assume greater risks of injury than nonparticipants"); Savino v. Robertson, 273 Ill. App. 3d 811, 817 (1995) ("plaintiff knowingly and voluntarily assume[d] the risks inherent [in playing the game of hockey]").

However, the inference from the factual allegations of the complaint is that the conduct in this case does not enjoy such wide acceptance. Plaintiff alleged that the relevant organizing bodies went so far as to display warnings on the players' uniforms in order to forestall checking from behind, and plaintiff alleged that Strevell and Zimmerman committed their illegal checks under circumstances that they should have understood to create a substantial risk of harm to the opponent. Thus, while we agree with Zimmerman that the player defendants should receive extra lenience given the physical nature of the game of hockey, we conclude that plaintiff has adequately pled Strevell's and Zimmerman's conduct as being willful and wanton even in the context of a hockey game.

As a side note, we observe that plaintiff objects to Zimmerman's references to the severity of the risk participants assume when they play hockey (i.e., the victim's state of mind), because he asserts the proper focus to be on the willfulness and wantonness of the defendant's conduct (i.e., the

defendant's state of mind). However, willfulness and wantonness must derive their meaning from the context of the game played. Conduct, such as checking another player, that would almost certainly be willful and wanton if undertaken during a softball game becomes acceptable if undertaken during a hockey game, and thus creates no inference of an antecedent appreciation of an unusual risk of injury for the opponent. Likewise, conduct, such as punching another participant, that would likely be willful and wanton during the course of play in football would be expected in a boxing match. The severity of the risk associated with playing a sport not only helps determine the scope of the contact sports exception (i.e., negligent or acceptable conduct a plaintiff could not use as a basis for liability), but also gives context to a defendant's actions and thus his or her state of mind in committing allegedly injurious acts. Put another way, the rougher the game, the larger the contact sports exception for negligence (and the higher the proverbial bar for conduct to exceed acceptable behavior and become willful and wanton[2]), and the weaker the inference that a particular instance of rough play was a result of a willful and wanton state of mind. Thus, though plaintiff is correct that the focus is on whether Strevell's and Zimmerman's acts were willful and wanton, the risks associated with hockey are relevant to that inquiry for their bearing on Strevell's and Zimmerman's states of mind.

In another argument, Strevell asserts that "players possess actual or constructive notice of the substantial risk of injury from checking from behind, since [hockey has] rules against checking from

---

[2]The corollary proposition to the commonly stated result of application of the contact sports exception, that a player may not sue based on another player's negligence, is that players agree to hold other players to a lower duty of care. See Pfister, 167 Ill. 2d at 421 (contact sports exception creates a "limited duty"). Thus, the duty of care owed varies inversely to the magnitude of the risks inherent in play. Football players owe one another a generally lower duty of care than do softball players.

behind." First, as noted above, we reject defendants' characterization of plaintiff's complaint as alleging only that Benjamin was checked from behind. Second, as noted above, plaintiff alleges conduct here that fell outside the scope of any notice of risk Benjamin would have appreciated. A competitor likely should not expect to be struck from behind while bent over with his head in a precarious position under the circumstances alleged in plaintiff's complaint. Third, we reject Strevell's position as absurd. Strevell essentially argues that, so long as there is a rule against specified conduct, participants have notice that the conduct might occur, and, therefore, such conduct cannot form the basis of liability. Strevell proposes, then, that a player be immunized from tort liability so long as he breaks the rules of the competition in which he engages. The proper inquiry looks not at whether the alleged act violated the rules of the sport, but whether it was willful and wanton, regardless of whether the rules prohibited it.

Strevell argues that three "factually on point" cases dictate dismissal of plaintiff's claim. However, each of the three cases is readily distinguishable, because each case involves injuries sustained as a result of conduct normally undertaken in the game at issue and not as a result of allegedly willful and wanton conduct. In Azzano v. Catholic Bishop, 304 Ill. App. 3d 713 (1999), the appellate court affirmed the trial court's granting of summary judgment in favor of a defendant who injured the plaintiff by knocking him to the ground during a game of "killerball," a team contest resembling a kind of tackle keep-away. In Savino, the appellate court rejected a plaintiff's proposed distinction between pre-game and in-game activities and held that the plaintiff was required to and failed to allege willful and wanton conduct where the defendant accidentally hit the plaintiff in the eye with a puck while firing a warmup shot at a nearby goal. Savino, 273 Ill. App. 3d at 813-17. Likewise, in Keller v. Mols, 156 Ill. App. 3d 235 (1987), the appellate court affirmed the trial court's

summary judgment finding that there was no proof of willful and wanton conduct where the defendant accidentally hit the plaintiff in the eye when he shot a plastic puck during a game of street hockey. Here, by contrast, plaintiff alleges not that Benjamin was injured as a result of normal game play, but rather by the player defendants' extraordinary acts of checking him from behind while he was partially bent over with his head pointed toward the nearby boards.

Strevell also relies on Ward v. Community School District No. 220, 243 Ill. App. 3d 968 (1993), in urging a contrary result. In Ward, the plaintiff was sitting on the sideline watching a flag football game during a physical education class. The field he was sitting by was situated end-to-end with another school's football field. Ward, 243 Ill. App. 3d at 970. As he watched the game, a participant in a game in the adjacent field ran into and severely injured the plaintiff as the participant was attempting to catch a pass. Ward, 243 Ill. App. 3d at 970. The plaintiff sued the schools and the school district for willful and wanton conduct in placing the two fields so closely together, without warning or protecting students from the potential dangers that could result from the field placement. Ward, 243 Ill. App. 3d at 970-71. The appellate court held that, though the defendants exposed children to a risk that could be found unreasonable, the alleged conduct was not of the degree necessary to state a cause of action for willful and wanton conduct. Ward, 243 Ill. App. 3d at 976.

Ward, like the other cases upon which Strevell relies, is readily distinguishable from the current case. Here, plaintiff alleges that Strevell and Zimmerman approached him under circumstances that create an inference that they fully appreciated the risk and possibility of injury to Benjamin and proceeded to check him from behind while his head was in a vulnerable position. This is not a case of an entity disregarding an abstract possibility of risk but, rather, of two defendants

allegedly disregarding an immediate and readily ascertainable risk. The facts here give rise to a much stronger inference of willfulness and wantonness than do the facts in Ward.

Taking plaintiff's allegations as true and drawing all reasonable inferences therefrom in favor of plaintiff, we conclude that plaintiff has alleged sufficient facts to support a claim that Strevell's and Zimmerman's willful and wanton conduct caused Benjamin's injury, and we therefore hold that the trial court erred in dismissing the first count of plaintiff's second amended complaint.

Plaintiff second argues that the trial court erred in dismissing counts II, IV, and VI of his second amended complaint, which alleged negligence against NCRHA, AHAI, and IHOA, on the basis that those organizations did not owe plaintiff a normal duty of reasonable care. The trial court reached this ruling by relying on the organizational defendants' argument that the contact sports exception to the general duty rule should apply not only to protect sports participants, but also sports organizers. Plaintiff again asserts on appeal that the organizational defendants owed him a general duty of care, and the organizational defendants again rebut this assertion by arguing that the contact sports exception precludes such a duty. We must therefore examine the rationales underlying the contact sports exception to determine if it should be extended beyond its currently understood scope. While we agree with the organizational defendants that the exception extends to organizers, we agree with plaintiff that the counts of negligence against the organizational defendants should not have been dismissed on that basis in this case.

The contact sports exception was first announced in Illinois in Nabozny v. Barnhill, 31 Ill. App. 3d 212 (1975), wherein the court formulated the policy based on the following considerations:

> "This court believes that the law should not place unreasonable burdens on the free and vigorous participation in sports by our youth. However, we also believe that organized,

athletic competition does not exist in a vacuum. Rather, some of the restraints of civilization must accompany every athlete [onto] the playing field. ***

\*\*\*

For these reasons, this court believes that when athletes are engaged in an athletic competition *** a player is *** charged with a legal duty to every other player on the field to refrain from conduct proscribed by a safety rule. A reckless disregard for the safety of other players cannot be excused." Nabozny, 31 Ill. App. 3d at 215.

Since Nabozny, Illinois courts have revisited the contact sports exception several times, expanding it to include unorganized, informal, and spontaneous sports activities and games. Azzano, 304 Ill. App. 3d at 716-17, citing Pfister, 167 Ill. 2d 417, Landrum v. Gonzalez, 257 Ill. App. 3d 942 (1994), and Keller, 156 Ill. App. 3d 235. The controlling question in determining whether a participant may maintain a negligence action against his or her opponent for causing an injury is whether the participants were engaged in a contact sport. Azzano, 304 Ill. App. 3d at 717. If the participants were engaged in a contact sport, they are liable to each other only for injuries that occurred as a result of willful or wanton conduct. Pfister, 167 Ill. 2d at 420; see also Zurla v. Hydel, 289 Ill. App. 3d 215, 221 (1997), quoting Thompson v. McNeill, 53 Ohio St. 3d 102, 106, 559 N.E.2d 705, 709 (1990) (rejecting the Illinois formulation of a contact sports exception because " '[t]he *** distinction does not sufficiently take into account that we are dealing with a spectrum of duties and risks rather than an either-or distinction' ").

Tangentially, we dispute the notion from Thompson that the Illinois contact sports exception is not sufficiently flexible to the circumstances presented. As implied above, the Illinois contact sports exception does allow a court to take into account "a spectrum of duties and risks": though the contact

sports exception either bars actions for negligence or does not, the scope of protected acceptable or negligent conduct (as opposed to willful and wanton conduct) depends on the risks associated with the sport played, and, as discussed below, it applies to risks inherent in play of the relevant game. Hockey players engage in a rougher sport, and thus owe one another generally lesser duties of care, than do baseball players. Just as duty varies with the situation presented, so too does the scope of the contact sports exception.

Though no court has expressly said so, the legal basis for the contact sports exception in Illinois appears to derive in significant part from the principles supporting the implied assumption of the risk doctrine. Assumption of risk exists to bar liability for negligent acts where a plaintiff assumes known risks inherent in a particular activity or situation. Sullivan-Coughlin v. Palos Country Club, Inc., 349 Ill. App. 3d 553, 560 (2004). In non-strict-liability negligence actions in Illinois, implied assumption of the risk as a defense is confined to situations where the defendant and the plaintiff have a contractual or employee-employer relationship. Court v. Grzelinkski, 72 Ill. 2d 141 (1978). This policy is apparently based on the idea that the "intrinsic merits" of the doctrine do not warrant its wide application, because it is duplicative of and often confused with contributory negligence or lack of duty. See Barrett v. Fritz, 42 Ill. 2d 529, 534-37 (1969) (affirming limitations on applying the doctrine based on criticism of the doctrine). We do not propose to overrule the long-standing limitation on assumption of the risk under Illinois law; indeed, we are without authority to do so (see Wreglesworth v. Artco, Inc., 316 Ill. App. 3d 1023, 1030 (2000) ("We are bound by the principle of stare decisis and must adhere to the decisions of our supreme court")). Rather, we examine the doctrine as it elucidates the logical bases of the contact sports exception so that we may determine if the bases for the exception justify its extension to the organizational defendants in this case, or, put

another way, whether the policy arguments in favor of the contact sports exception justify a holding

that sports coaches and organizers owe no duty to protect players from negligence (or other dangers)

inherent in the relevant sport.[3]

Several courts applying or extending the contact sports exception have done so based on the

idea that the plaintiff assumed certain risks associated with the activity that led to his or her injury.

For example, in Azzano, the appellate court determined that "killerball" was a contact sport; it noted

that "a certain amount of physical contact was inevitable in the game of killerball and *** the parties

voluntarily assented to the contact by participating." Azzano, 304 Ill. App. 3d at 717. The court also

discussed the policy underpinnings of the contact sports exception as follows:

> "It is unlikely that the supreme court [in Pfister] was concerned with promoting free and
>
> vigorous participation in sports or in the development of discipline and self control[, the two
>
> policy rationales cited by the court in Nabozny,] when it applied the contact sports exception
>
> to a spontaneous game of kick the can in a college dormitory lobby. Rather, the supreme
>
> court made it clear that the public policy underlying the contact sports exception today is the
>
> need to strike a balance between protecting participants in sporting activities and the
>
> voluntary nature of participation in games where physical contact is inherent and inevitable.
>
> This balance is achieved by limiting liability where the participant chooses to participate in an
>
> activity in which physical contact and the risk of injury are inherent. Pfister makes it clear that

---

[3]Those below-cited Illinois contact sports cases that do discuss assumption of the risk

apparently assume the existence of or overlook the requirement for a contractual or employment

relationship, or rely on the assumption doctrine, just as we do, to describe the rationale of the contact

sports exception.

the application of the contact sports exception turns solely on the choices made and the risks voluntarily assumed by the participants." Azzano, 304 Ill. App. 3d at 718.

Indeed, in Pfister, the supreme court affirmed the contact sports exception by noting that "[p]articipants in team sports, where physical contact among participants is inherent and virtually inevitable, assume greater risks of injury than nonparticipants or participants in noncontact sports." Pfister, 167 Ill. 2d at 425.

In Savino, the appellate court rejected a distinction between pre-game and in-game activities in applying the contact sports exception. Savino, 273 Ill. App. 3d 811. The court first discussed a New York case applying assumption of the risk and consent principles to determine liability for an injury incurred during warm-up activities. Savino, 273 Ill. App. 3d at 816, discussing O'Neill v. Daniels, 523 N.Y.S.2d 264, 135 A.D.2d 1076 (N.Y. App. Div. 1987). The court then offered a brief discussion of the effect of the assumption of the risk doctrine under Illinois law (Savino, 273 Ill. App. 3d at 816-17) before holding that the plaintiff "was no less a participant in a team sport merely because he was engaged in warm-up activities at the time of his injury."

Likewise, in Novak v. Virene, 224 Ill. App. 3d 317, 321 (1991), the appellate court noted that "[m]any activities in life are fraught with danger, and absent a specific assumption of the risk, one may obtain damages when injured by another's negligence." However, the court held that downhill skiing was not a contact sport because, by skiing, "one does not voluntarily submit to bodily contact with other skiers, and such contact is not inevitable." Novak, 224 Ill. App. 3d at 321.

In another case, Sullivan-Coughlin, the appellate court discussed the implied assumption of the risk doctrine in connection with a plaintiff golfer's action for negligence where she was struck by the defendant's errant golf ball. Sullivan-Coughlin, 349 Ill. App. 3d at 560. Though it did not discuss

the applicability of the contact sports exception, the court held that implied assumption of the risk was inapplicable there because " 'golf is simply not the type of game in which participants are inherently, inevitably or customarily struck by the ball.' " Sullivan-Coughlin, 349 Ill. App. 3d at 560, quoting Zurla, 289 Ill. App. 3d at 221. Zurla, the case upon which Sullivan-Coughlin relied, examined the contact sports exception before holding that "golf is not properly characterized as a 'contact sport' for purposes of the Nabozny rule." Zurla, 289 Ill. App. 3d at 222. These two cases in combination, along with the other cases considering the contact sports exception, further support the idea that courts turn to assumption of the risk principles in defining the reach of the contact sports exception.

We do note at least one case involving the contact sports exception, Landrum v. Gonzalez, that at first glance appears to militate against our conclusion that the exception is based on assumption of the risk principles. Normally, in order to be a complete bar to negligence liability, assumption of the risk requires the plaintiff's subjective appreciation of the risk he or she is said to assume. Duffy v. Midlothian Country Club, 135 Ill. App. 3d 429, 433-36 (1985) (without considering contact sports exception, applying assumption of the risk as a bar to recovery in negligence for a golf spectator who assumed known risks inherent in a particular activity when he was hit with an errant golf ball); W. Prosser, Torts §68, at 447 (4th ed. 1971), quoting Cincinnati, N.O. & T.P. Ry. Co. v. Thompson, 236 F. 1, 9 (6th Cir. 1916) (" 'Knowledge of the risk is the watchword of assumption of [the] risk' "). However, in Landrum, the court held that the question of whether the contact sports exception applies is to be based on the objectively determined risk associated with the game played, as opposed to the injured plaintiff's subjective knowledge of the risks of the game. Landrum, 257 Ill. App. 3d at 947-48, citing Keller, 156 Ill. App. 3d at 237. Though we note the

inconsistency between <u>Landrum</u> and the seemingly prevalent rationale for the contact sports exception, we have no doubt that the approach in <u>Landrum</u> is a correct statement of Illinois law, which, as noted, states that a participant is barred from suing a co-participant not because of assumption of the risk but instead because no duty of reasonable care exists in contact sports situations.[4]

However, despite appearances, in some situations <u>Landrum</u>'s statement may be reconcilable with the concepts behind assumption of the risk principles. <u>Landrum</u> apparently includes within the contact sports exception both risks the plaintiff subjectively appreciated and risks the plaintiff should have appreciated (<u>i.e.</u>, risks that objectively existed). If the player's subjective expectations are unreasonable, and thus if the player should have appreciated the risks of the sport, then the doctrine of assumption of the risk would not apply, but comparative negligence would. See <u>Alvis v. Ribar</u>, 85 Ill. 2d 1 (1981) (adopting comparative negligence scheme in Illinois to replace former contributory negligence scheme), abrogated by Ill. Rev. Stat. 1991, ch. 110, par. 2--1116 (now 735 ILCS 5/2--1116 (West 2004)) (adopting partial comparative negligence scheme wherein a plaintiff is barred from

---

[4]That said, we note that the statement in <u>Landrum</u> is based on a passage from <u>Keller</u> in which the court concluded that the players' descriptions of the game " 'reveal[ed] the adaptation of ordinary hockey rules for their game and corroborate[d] the common conception of hockey as a contact sport.' " <u>Landrum</u>, 257 Ill. App. 3d at 948, quoting <u>Keller</u>, 156 Ill. App. 3d at 237. The quoted passage supports the idea that the players subjectively established and appreciated the relevant risks based on an adaptation of a commonly understood set of rules, and not the idea that the risks of the contact sport are to be determined objectively and without regard to the individual players' expectations.

recovery if more than 50% at fault, but recovery diminished in proportion to fault if plaintiff is no more than 50% at fault); D. Lazaroff, Torts & Sports: Participant Liability to Co-Participants for Injuries Sustained During Competition, 7 U. Miami Ent. & Sports L. Rev. 191, 207 ("If plaintiff does not appreciate the risk and is unreasonable in not doing so, then comparative fault principles apply"); W. Prosser, Torts §68, at 448 (4th ed. 1971) (the plaintiff's "failure to exercise ordinary care to discover the danger is not properly a matter of assumption of the risk, but of the defense of contributory negligence").[5] Further, if a plaintiff's conduct in encountering a known risk is unreasonable, "his conduct is a form of contributory negligence, in which the negligence consists in making the wrong choice and voluntarily encountering [such] a known unreasonable risk [or accepting a reasonable risk but failing to exercise proper care against it]." W. Prosser, Torts §68, at 441 (4th ed. 1971). Landrum could be seen as analyzing these instances of a plaintiff's comparative negligence under the label of the contact sports exception.

That said, we acknowledge two points that make Landrum difficult to reconcile with our discussion here. First, it is possible that a plaintiff, based on circumstances he or she reasonably had

_____

[5]Contributory and comparative negligence are both based on the same idea--that a plaintiff should not be allowed unfettered recovery when the plaintiff him or herself is at fault. Under the contributory negligence doctrine, a plaintiff is barred from recovering compensation for his or her injuries if the plaintiff's negligence contributed to the accident. Alvis, 85 Ill. 2d at 5. Under the comparative negligence doctrine, a plaintiff's recovery is diminished in proportion to the amount of negligence attributable to him or her. Alvis, 85 Ill. 2d at 11. As noted, Illinois employs a hybrid of the two schemes. See 735 ILCS 5/2--1116 (West 2004). We use the two terms without distinction throughout.

the opportunity to observe, would not be aware of the objectively physical nature of a game. In such a situation, absent some other negligence by the plaintiff in agreeing to join the game or failing to appreciate the risks of the game, or some negligent or willful act or omission by a defendant misleading the plaintiff regarding the nature of the game, the statement in Landrum that application of the contact sports exception turns on the objective characteristics of the relevant game cannot be reconciled with a straightforward application of assumption of the risk principles. Second, the ultimate effect of a plaintiff's comparative negligence in a case where the plaintiff negligently failed to appreciate a risk (and thus did not assume the risk) would unlikely per se amount to the same effect as an assumption of the risk causing the complete bar to a negligence action, because it could not be presumed that a plaintiff would have assented to a category of risk (or to the defendant's negligence) had the plaintiff acted reasonably to understand the risks. Instead, the plaintiff's negligence would be considered under the Illinois partial comparative negligence statute. See 735 ILCS 5/2--1116 (West 2004). In a case where the plaintiff's level of fault is found to be no more than 50%, and thus the plaintiff is not completely barred from recovery, assumption of the risk principles would diverge from the holding in Landrum. Accordingly, we recognize that Landrum (and the idea that the contact sports exception is a "no duty" rule rather than an assumption of the risk rule) cannot fully be reconciled with our discussion.

Having determined that the contact sports exception finds partial justification in the doctrine of assumption of the risk, we must examine that doctrine to determine its application to this case. Common law recognizes three types of assumption of the risk: express assumption of the risk, primary implied assumption of the risk, and secondary implied assumption of the risk. Duffy v. Midlothian Country Club, 135 Ill. App. 3d 429, 433-34 (1985). Under express assumption of the

risk, a plaintiff and a defendant explicitly agree in advance that the defendant owes no legal duty to the plaintiff and that the plaintiff therefore cannot recover for injuries caused either by risks inherent in the situation or by dangers created by the defendant's negligence. Duffy, 135 Ill. App. 3d at 433. Primary implied assumption of the risk, which is the type of risk assumption at issue here, exists when a plaintiff assumes known risks inherent in a particular activity or situation and thus assumes risks created not by the defendant but by the situation itself. Sullivan-Coughlin, 349 Ill. App. 3d at 560. Secondary implied assumption of the risk occurs where a plaintiff knowingly encounters a particular risk created by a defendant's negligence (Duffy, 135 Ill. App. 3d at 433-34), and thus both the plaintiff and the defendant share responsibility for the plaintiff's injury.

Because the risks assumed with primary implied assumption of the risk are those created not by the defendant but rather by the nature of the activity, it has been stated that primary implied assumption of the risk is not a true negligence defense because no action for negligence is ever alleged. Duffy, 135 Ill. App. 3d at 433.

This statement highlights the interplay in the sports context between the concepts referred to above of assumption of the risk and duty. See Knight v. Jewett, 3 Cal. 4th 296, 308, 834 P.2d 696, 703, 11 Cal. Rptr. 2d 2, 9 (1992) ("those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk--the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk' "); Ordway v. Superior Court, 198 Cal. App. 3d 98, 104, 243 Cal. Rptr. 536, 539 (1988) (implied assumption of risk is "only another way of stating that the defendant's duty of care has been reduced in proportion to the hazards attendant to the event"); O'Neill v. Daniels, 523 N.Y.S.2d 264, 265, 135 A.D.2d 1076, 1077 (N.Y. App. Div. 1987) (duty of care owed to a plaintiff

must be evaluated by considering the risks the plaintiff assumed and how those assumed risks qualified the defendants' duty to him); W. Prosser, Torts §68, at 440 (4th ed. 1971) (the primary implied assumption of the risk doctrine results in the "defendant *** simply [being] relieved of the duty which would otherwise exist"). Assumption of the risk may be viewed as consent to absolve a defendant of negligence or as consent to hold a defendant to a lower duty of care, such that actions that would normally be considered negligent would no longer be so considered. Thus, the doctrine either absolves negligence or changes the standard of care. See F. James, Jr., Assumption of Risk: Unhappy Reincarnation, 78 Yale L. J. 185, 190 (1968) (assumption of the risk "is simply a confusing way of stating certain no duty rules or, where there has been a breach of duty toward plaintiff, simply one kind of contributory negligence");[6] see also Restatement (Second) of Torts §496A, Comment c (1965) (assumption of the risk relieves defendant of duty to plaintiff). (Significantly, as it affects our policy discussion here, the contact sports exception is also viewed as doing either or both. See Pfister, 167 Ill. 2d at 425-26 (trial court "properly applied the contact sports exception bar to liability for injuries caused by *** negligence"); Pfister, 167 Ill. 2d at 421 (contact sports exception creates a limited duty for sports participants).) As stated above, this overlap in assumption of the risk between "no duty" principles and contributory negligence is part of the reason that implied assumption of the risk is not employed under Illinois law absent a contractual or employment relationship. Barrett, 42 Ill. 2d at 534 (assumption of the risk is not a useful tool, because it is

---

[6]Professor James first advanced the distinction between primary and secondary assumption of the risk in advocating the abolition of the doctrine of assumption of the risk as a separate defense. J. Diamond, L. Levine, & M. Madden, Understanding Torts, §15.04, at 272 n.70, 73 (2nd ed. 2000), citing F. James, Jr., Assumption of Risk, 61 Yale L. J. 141 (1952).

overlapped by the ideas of consent, lack of duty, and contributory negligence). However, we note that the two concepts--lack of duty and assumption of the risk vitiating negligence--are not entirely equal. Indeed, the difference in phrasing can be significant because terming assumption of the risk an absolution for negligence frames the doctrine as a defense to be asserted and proven by a defendant, while terming it as changing the standard of care removes the defendant's duty as a matter of law and relieves the burden of establishing the assumption defense. Also, as demonstrated in Landrum, a "no duty" rule relies on the objective nature of the sport played, while an assumption of the risk rule would rely on the plaintiff's subjective knowledge of the sport played.

We further note that assumption of the risk in this context would not overlap with contributory negligence as it would in most other cases. The generally stated explanation for this overlap is as follows. See E. Kionka, Implied Assumption of the Risk: Does It Survive Comparative Fault?, 1982 S. Ill. L. J. 371, 382-86 (1982) (relied on throughout this paragraph). Implied assumption of the risk can be divided into reasonable and unreasonable assumption of the risk. Any unreasonable assumption of the risk would obviously equate to comparative or contributory fault by the plaintiff. "Reasonable" assumption of the risk, which by definition does not involve the plaintiff's fault, is essentially an illusory concept. In order to be said to assume a risk, a plaintiff must be aware of the risk and show a willingness to accept it voluntarily. The concept is similar to that of consent in intentional torts. See also W. Prosser, Torts §68, at 440 (4th ed. 1971) ("The situation [with express assumption of the risk] is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury"); W. Prosser, Torts §68, at 445 (4th ed. 1971) ("the basis of the defense is not contract but

consent"). The issue of whether a plaintiff has consented to a risk has been dealt with by Professor Kionka, who offers the following illustration:

> "[A]ssume that plaintiff is badly hurt and in need of immediate medical attention. Defendant offers him a ride in his car, saying 'My brakes are in terrible condition [due to the defendant's negligence in maintaining the brakes], and may go out any time.' Plaintiff nevertheless accepts the ride, the brakes fail en route, and plaintiff is seriously injured." E. Kionka, Implied Assumption of the Risk: Does It Survive Comparative Fault?, 1982 S. Ill. L. J. at 383 (1982).

In that case, the plaintiff was not negligent--accepting the ride was his only reasonable alternative--but neither did he "manifest consent that defendant be excused from his potential negligence liability" (E. Kionka, Implied Assumption of the Risk: Does It Survive Comparative Fault?, 1982 S. Ill. L. J. at 383 (1982)) by acquiescing in the risk of the defendant's faulty brakes.[7] His undertaking the risk in such a case is not voluntary but, rather, is compelled by circumstances, and thus, without intentional and voluntary exposure to a risk, consent to forgo suit cannot be implied and assumption of the risk should not apply. Therefore, under the above discussion, because reasonable assumption of the risk is illusory in most circumstances, only unreasonable assumption of the risk remains, and that concept is subsumed into contributory and comparative negligence.

However, the situation here belies a sweeping generalization based on the discussion above. In the situation presented here, by contrast, by participating in contact sports, a plaintiff does manifest his or her voluntary consent to allow other players' negligence--such conduct is inherent in the game.

---

[7]The "lack of actual consent" argument should apply with equal force to unreasonable assumption of the risk, but because such negligent risk assumption will always be fully subsumed into contributory negligence, the consent argument adds nothing to the discussion here.

Also, while there are likely situations, such as a situation involving a clearly overmatched plaintiff, in which a plaintiff may give such implied (or express) consent negligently, granting the consent under normal circumstances would be entirely reasonable, as even the courts of this state have indicated that sports participation is to be encouraged. See Nabozny, 31 Ill. App. 3d at 215.

Because assumption of the risk in the contact sports context is analytically distinct from a "no duty" rule and is not subsumed into a comparative fault rule, the reasons for restricting the application of the assumption of the risk rule do not apply. Given that, there may be policy considerations that support extending the assumption of the risk to this context. The rule, apparently espoused in Landrum, that the proper analytical approach is simply to assume that there is no duty owed among contact sports co-participants, provides certainty for those participants on the issue of when their otherwise negligent conduct will be acceptable, instead of particularizing the question based on each individual plaintiff's assumption of the risks of the game (or associated negligence). Thus, the "no duty" approach encourages vigorous participation in sport and provides certainty in the law. Further, if an assumption of the risk policy were to be adopted, a plaintiff who reasonably assesses the risks of an activity and nonetheless assumes them would be barred from asserting a negligence claim, while a plaintiff who unreasonably fails to assess the risks of an activity will be barred from asserting the same claim only if the plaintiff's percentage of fault (including the fault in failing to assess the risks of the activity) is greater than 50%. See 735 ILCS 5/2--1116 (West 2004) (a plaintiff is barred from recovering damages where the plaintiff is more than 50% at fault, and, if the plaintiff's percentage fault is less than or equal to 50%, the plaintiff's recovery is diminished in proportion to his or her percentage fault). Thus, the doctrine of assumption of the risk in this context may inequitably and counterintuitively reward unreasonable plaintiffs. However, a plaintiff who consciously assumes the

risks of participating in a contact sport also consciously assents not to require a duty of care from co-participants and thus willingly relinquishes a legal right. Put another way, an implied consent to a risk in this context is no less a consent than an express consent. Equitable or not, an unreasonable plaintiff who does not relinquish his or her legal rights in a similar manner would have to be proven to have acted unreasonably before the plaintiff's assertion of liability would be precluded or the plaintiff's recovery reduced.

On the other hand, analyzing the contact sports exception under assumption of the risk principles defines a plaintiff's legal rights in terms of his or her own actions--i.e., it does not allow a plaintiff to forgo a negligence cause of action unwittingly. Or, as stated by Professor Prosser, "What, in [a case where the plaintiff is not at fault but understands a particular risk], changes 'duty' to 'no duty;' and if it is not to be called assumption of risk, what better name can be found? And should not the burden be upon the defendant to establish the change in the situation?" W. Prosser, Torts §68, at 455-56 (4th ed. 1971).[8]

Knight, discussed below, addressed this policy choice and decided in favor of the "no duty" approach, for three basic reasons. See Knight, 3 Cal. 4th at 311-13, 834 P.2d at 705-06, 11 Cal. Rptr. 2d at 11-12. First, the California Supreme Court noted that the idea of implied consent would apply as much to an unreasonable plaintiff as to a reasonable one, but California law provided that an unreasonable plaintiff undertaking a risk is not completely barred from recovery. Knight, 3 Cal.

---

[8]Again, the counterargument to this point, that a reasonable plaintiff would not truly consent (and therefore not truly assume the risk), does not apply in the contact sports context, where the plaintiff is reasonable and his conduct implies not merely acquiescence but actual voluntary reasonable participation in a risk and thus actual consent to forgo suit based on the risk.

4th at 311, 834 P.2d at 705, 11 Cal. Rptr. 2d at 11.  Of course, if assumption of the risk were seen to refer to instances of implied consent, it would diverge from a plaintiff's contributory negligence and, in the case of an unreasonable plaintiff who assumes a risk, either concept would act as a defense against the negligent plaintiff's claim.  Second, the California Supreme Court argued that "[i]t may be accurate to suggest that [a participant] 'consents to' or 'agrees to assume' the risks inherent in the activity or sport itself," but "it is thoroughly unrealistic to suggest that *** an individual consents to *** a breach of duty by others that increases the risks inevitably posed by the activity or sport itself." Knight, 3 Cal. 4th at 311, 834 P.2d at 705, 11 Cal. Rptr. 2d at 11.  This statement overstates the reach of the implied consent, which would apply only to those risks inevitably posed by the sport itself, not to conduct that increases the risks posed beyond that threshold.  Third, Knight argues that a subjective assumption of the risk approach would cause "drastic disparities in the manner in which the law would treat defendants who engaged in precisely the same conduct, based on the often unknown, subjective expectations of the particular plaintiff."  Knight, 3 Cal. 4th at 313, 834 P.2d at 706, 11 Cal. Rptr. 2d at 12.  This, as noted, is a valid argument against the implied consent, assumption of the risk approach.

All of that said, as noted above, Illinois law is clear in stating that implied assumption of the risk does not apply outside of contractual or employment relationships, and thus the question has been decided in favor of the "no duty" approach, with the principles of assumption of the risk supplying part of the rationale for lowering the applicable duty of care.  We do not propose to alter that approach here; indeed, the "no duty" approach is consistent with the principles, other than assumption of the risk, discussed below that support the contact sports exception.  We provide the above discussion only to help contour our analysis.

We note that Nabozny was decided in 1975, and, six years later, our supreme court abandoned the doctrine of contributory negligence in favor of a comparative negligence scheme. Alvis, 85 Ill. 2d 1. The decision in Alvis was later abrogated by statute, and, under current Illinois law, a plaintiff is barred from recovering damages where the plaintiff is more than 50% at fault, and, if the plaintiff's percentage fault is less than or equal to 50%, the plaintiff's recovery is diminished in proportion to his or her percentage fault. 735 ILCS 5/2--1116(c) (West 2004). The fault to be considered under this partial comparative negligence scheme includes fault relating to assumption of the risk (i.e., the overlap between contributory negligence and assumption of the risk discussed above). 735 ILCS 5/2--1116(b) (West 2004). After the change in law, there may be some question as to the viability of the contact sports exception insofar as it is based upon assumption of the risk principles.

The comparative fault scheme in Illinois, however, has been held to have no effect on express assumption of the risk or implied primary assumption of the risk, even though it has been held to overrule implied secondary assumption of the risk. Savino, 273 Ill. App. 3d at 816-17. Two rationales have been offered for this holding. First, it has been said that "[i]mplied secondary assumption of risk is a form of fault resulting from unreasonable conduct by plaintiff." Wheeler v. Roselawn Memory Gardens, 188 Ill. App. 3d 193, 202 (1989). Indeed, as noted above, implied assumption of the risk, as a direct corollary to express assumption of the risk, must indicate that the plaintiff agrees not only to undertake the risk (i.e., acquiesces to the risk) but also that the plaintiff consents to the risk (and thus consents to forgo the right to sue based on injury from the risk). In most fact situations, a plaintiff who reasonably undertakes a risk does so not fully voluntarily, but because the risk offers the most viable alternative. Thus, there is no consent to the tort, and the

assumption of the risk is not complete. Of course, a plaintiff who unreasonably undertakes a risk is contributorily negligent. Therefore, an implied assumption of the risk almost always denotes an unreasonable choice by the plaintiff. But this fault concept is not a reason to distinguish primary from secondary implied risk assumption, because a plaintiff does not necessarily act reasonably in undertaking an express or primary implied assumption of a risk.

The second expressed rationale for the holding that the adoption of comparative negligence principles does not affect express or primary implied assumption of the risk but does affect secondary implied assumption of the risk is that "the secondary doctrine places greater burdens on plaintiff without his express consent." Duffy, 135 Ill. App. 3d at 434. However, again, that statement is no less true of primary implied assumption of the risk.

The reason the principles of assumption of the risk should survive enactment of a partial comparative negligence scheme is, as discussed above, the idea that assumption of the risk, especially in the context presented here, may exist independently of any fault by the plaintiff, and a plaintiff, even when not at fault, should be held to the terms of his or her express or implied consent to certain risks. See W. Prosser, Torts §68, at 441 (4th ed. 1971) ("Obviously [contributory negligence and assumption of the risk] may coexist when the plaintiff makes an unreasonable choice to incur the risk; but either may exist without the other"). This holds true regardless of the type of assumption of the risk at issue.

Further, we note that in 1995, in Pfister, our supreme court affirmed and applied the contact sports exception and in fact examined the exception in light of risk assumption principles, after Illinois adopted the above-described partial comparative negligence scheme. Pfister, 167 Ill. 2d 417. Therefore, because the supreme court implicitly viewed the contact sports exception as surviving

Illinois' adoption of partial comparative fault and partially relied on risk assumption principles to do so, we are confident in taking the same approach. Wreglesworth, 316 Ill. App. 3d at 1030 ("We are bound by the principle of stare decisis and must adhere to the decisions of our supreme court").

Based on the above discussion of applications of the contact sports exception, it appears that the exception is premised on the idea that participants in contact sporting games assume and consent to risks associated with the physical nature of those games. Also based on the above discussion, we conclude that the principles underlying assumption of the risk--primarily, that the plaintiff has consented to a risk--apply with equal force as protection for co-participants and as protection for organizers based on the conduct of co-participants. A plaintiff no less assumes the risk of a co-participant's negligent conduct if the conduct is brought about by some antecedent negligence from another party. Put another way, a coach's or organizer's negligence leading to a player's negligence does not increase the risks inherent in the game, which, as recognized by Illinois law, include negligent play. As such, we agree with the organizational defendants that the consent granted by each participant is not specific to the similarly situated participants, but instead to the risks associated with the game, regardless of whether the risks stem from co-participants or some other source. Thus, to the extent that the contact sports exception is based on assumption of the risk, the policy considerations underlying that doctrine lead us toward expanding the exception to organizers and coaches.

Our approach on this issue is hardly novel in tort law, and, indeed, other jurisdictions considering the issues posed here have reached similar legal conclusions.[9] The seminal case on the

_____

[9]As may be expected, there are also jurisdictions that have not followed our approach. We highlight here only cases that help illustrate our approach and note that our discussion of the law of

issue of sports participation liability is <u>Knight</u>, 3 Cal. 4th 296, 834 P.2d 696, 11 Cal. Rptr. 2d 2. There, the plaintiff was injured during the course of an informal touch football game amongst friends when the defendant, whom the plaintiff had cautioned for what she perceived to be his overly rough play, accidentally knocked over the plaintiff and stepped on her hand. <u>Knight</u>, 3 Cal. 4th at 300, 834 P.2d at 697, 11 Cal. Rptr. 2d at 3. The California Supreme Court first determined the reach of the doctrine of assumption of the risk in light of the state's adoption of comparative fault principles in place of contributory fault principles, and it concluded that primary assumption of the risk survived that change in the law. <u>Knight</u>, 3 Cal. 4th at 303-15, 834 P.2d at 699-708, 11 Cal. Rptr. 2d at 5-14. It equated the primary assumption of the risk doctrine to a "no duty" rule, and it criticized the subjective assumption of the risk (implied consent) approach described above in favor of the "no duty" approach, also described above. See <u>Knight</u>, 3 Cal. 4th at 311-13, 834 P.2d at 705-06, 11 Cal. Rptr. 2d at 11-12 . Based on this discussion, the California Supreme Court noted that "[a]lthough defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." <u>Knight</u>, 3 Cal. 4th at 315-16, 834 P.2d at 708, 11 Cal. Rptr. 2d at 14. But the careless conduct of others is often treated as an inherent risk of a sport. <u>Knight</u>, 3 Cal. 4th at 316, 834 P.2d at 708, 11 Cal. Rptr. 2d at 14. Thus, the court in <u>Knight</u> adopted the rule that a participant in an "active sport breaches a legal duty of care to other participants *** only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." <u>Knight</u>, 3 Cal. 4th at 320, 834 P.2d at 711, 11 Cal. Rptr. 2d at 17. Accordingly, the court

---

other jurisdictions is not meant to be exhaustive.

concluded that the plaintiff's action was barred by the primary assumption of the risk doctrine. Knight, 3 Cal. 4th at 320, 834 P.2d at 712, 11 Cal. Rptr. 2d at 18. (We note above that assumption of the risk and lack of duty are interrelated but distinct concepts, and we do not repeat that discussion here.)

The holding in Knight was applied in a coaching supervision case in Balthazor v. Little League Baseball, Inc., 62 Cal. App. 4th 47, 72 Cal. Rptr. 2d 337 (1998). There, a little league baseball player sued his league after he was injured by a pitch that hit him in the face. Balthazor, 62 Cal. App. 4th at 49, 72 Cal. Rptr. 2d at 338. The California Appellate Court first turned to Knight for its discussion of primary assumption of the risk as it relates to the duty owed to sports participants. Balthazor, 62 Cal. App. 4th at 49-50, 72 Cal. Rptr. 2d at 339. The court then noted that, according to established case law, "instructors 'have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.' " Balthazor, 62 Cal. App. 4th at 50, 72 Cal. Rptr. 2d at 339. Based on that rule, the court rejected the plaintiff's arguments that the league should be held liable for allowing the game to continue when the sun began to set (and thus visibility was poor) and allowing a pitcher with erratic control of his pitches to remain in the game, because each of those risks was inherent in the game played. Balthazor, 62 Cal. App. 4th at 51-52, 72 Cal. Rptr. 2d at 340-41 .

Our decision here, that, so long as the player defendants' conduct was negligent or acceptable, the organizational defendants are protected by the Illinois contact sports exception, is consistent both with the assumption of the risk rationale employed in Knight and also with its oft-quoted statement that the duty of care in contact sports is to avoid "increas[ing] the risks to a participant over and above those inherent in the sport." So long as Strevell's and Zimmerman's conduct was negligent or

acceptable, it was inherent in the sport, and any negligence by the organizer-defendants leading to such negligent/acceptable conduct thus could not have increased the risks to Benjamin over and above those inherent in the sport.

More courts from other states rely on Knight (or similar reasoning) in defining the scope of sports liability in their respective jurisdictions. In Kelly v. McCarrick, 155 Md. App. 82, 841 A.2d 869 (2004), the Court of Special Appeals of Maryland considered a case in which a plaintiff was injured while trying to tag a sliding member of the opposing team during a softball game. Among the grounds for the plaintiff's suit was that the plaintiff was injured as a result her coaches' failure to instruct her on how to avoid injury. Kelly, 155 Md. App. at 87, 841 A.2d at 873. The Kelly court examined the doctrine of assumption of the risk and determined that it applied to negligent coaching situations. Kelly, 155 Md. App. at 101-15, 841 A.2d at 875-88. It also cited, and apparently relied on, the California rule that a coach should be liable only where he or she increases the inherent danger of a sport. Kelly, 155 Md. App. at 104, 841 A.2d at 889, citing Kahn v. East Side Union High School District, 31 Cal. 4th 990, 75 P.3d 30, 4 Cal. Rptr. 3d 103 (2003). Thus, it held that the plaintiff assumed the risk of injury as a result of a slide play, and she could not recover. Kelly, 155 Md. App. at 115, 841 A.2d 892-93.

In Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 807 A.2d 1274 (2002), the plaintiff sued several organizers of a recreational softball tournament game in which she was struck in the head with an errantly thrown softball. The New Hampshire Supreme Court began its analysis by discussing the origins of the doctrine of primary assumption of the risk before determining that the doctrine, which it termed a "no duty" rule, applied. Allen,148 N.H. at 415-16, 807 A.2d at 1282-83. Based on this doctrine, the court "conclude[d] that when [the plaintiff] voluntarily played

softball--a reasonable activity that she knew involved obvious risks--the [organizer] defendants had no duty to protect her against injury caused by those risks." Allen, 148 N.H. at 416, 807 A.2d at 1283. The Allen court went on to state that, when "extraordinary risks" were alleged, a negligence standard of care should apply instead of the "no duty" rule. Allen, 148 N.H. at 416-18, 807 A.2d at 1283-84. Thus, under Allen, a participant or organizer who creates only "normal or ordinary" risks does not breach a standard of care. Allen, 148 N.H. at 417-18, 807 A.2d at 1284. The holding in Allen mirrors our reasoning here and also our holding that organizers should not be liable for negligence leading to risks inherent in the game played but should be liable for negligence leading to noninherent risks (or for willful and wanton conduct in either event).

Plaintiff argues that the organizational defendants' alleged conduct--the failure to supervise and to prevent the injury--is a different risk than the misconduct attributed to Strevell and Zimmerman and therefore the contact sports exception cannot extend to protect the organizational defendants. We disagree. Plaintiff has alleged that the organizational defendants' allegedly tortious conduct was different, but the relevant risk to Benjamin--his being injured by a check from behind--remains the same. In other words, Benjamin consented to his co-players' and the organizers' negligence leading to risks inherent in the game of hockey in his league. See W. Prosser, Torts §68, at 445 (4th ed. 1971) ("the basis of [assumption of the risk] is not contract but consent"). Implicit in Benjamin's assumption of the risks associated with hockey was his consent to forgo negligence actions based on risks inherent in the game. Thus, based on assumption of the risk principles, it stands to reason that the contact sports exception should be extended to protect the organizers and coaches from liability

for negligence leading to player conduct that cannot otherwise form a basis for liability due to the contact sports exception.[10]

Aside from our discussion of assumption of the risk principles, our consideration of the other contact sports exception policy goals announced in Nabozny and Pfister leads us toward the same result. As stated in those cases, the other policy considerations underlying the contact sports exception are that sports injuries due to negligence are inevitable and that " '[i]f every time a negligent foul resulted in injury, and liability was imposed, [sports] as we know [them] would not be played.' " Pfister, 167 Ill. 2d at 427, quoting Pfister v. Shusta, 256 Ill. App. 3d 186, 192 (1994) (Green, J., dissenting). Also, "the law should not place unreasonable burdens on *** free and vigorous participation in sports," even if "some of the restraints of civilization must accompany every athlete on to the playing field." Nabozny, 31 Ill. App. 3d at 215. Applying those considerations here, we note that organized sports would suffer a chilling effect similar to the one Pfister and Nabozny sought to avoid if organizers and coaches were to be held liable for the same inevitable negligent conduct. In order to avoid liability, organizers would be forced either to change the fundamental nature of the

--------

[10]This is consistent with Professor Prosser's example in which person A leaves his passenger in an automobile on the highway at night and then person B drives into the car from behind. W. Prosser, Torts §68, at 445 (4th ed. 1971). In that example, the passenger consents only to A's negligence, not B's, if B was negligent. W. Prosser, Torts §68, at 445 (4th ed. 1971). In other words, the passenger assumes the risk of a nonnegligent driver hitting the car by virtue of A's actions, but does not assume the risk of a negligent driver doing so, because that is an unforeseen interceding cause. However, just as Benjamin here, the passenger does assume the risk of any antecedent negligence causing (and thus subsumed into) A's negligence, because she consented to A's negligence.

games they organize or to withdraw completely from overseeing the games. In the first situation, the law would burden the free and vigorous participation in sports to such a degree as to change the nature of the sports. In the second situation, the law would forestall organized and coached sports competition altogether. Neither result is desirable, and extending the contact sports exception to protect organizers and coaches from liability stemming from the same negligence the exception already protects would serve the interests of the exception.

Of course, the above policy goals press against the countervailing policy goal of safety, as referenced in the above quote from Nabozny. See generally T. Fitzgerald, The "Inherent Risk" Doctrine, Amateur Coaching Negligence, and the Goal of Loss Avoidance, 99 Nw. U. L. Rev. 889 (2005) (arguing for liability for coaching negligence based on safety concerns and relative societal costs). However, though participant safety is a valid and prominent concern, it would scarcely be advanced by imposing a duty upon coaches and organizers in the manner sought here. Even if the organizational defendants were to be held liable for the player defendants' negligence, the very danger plaintiff seeks to reduce--the negligence of co-participants--would nevertheless continue. Holding coaches and organizers liable for their own negligence leading to negligent conduct by players may cause more conscientious coaching, but, as acknowledged by the case law, negligent play is an unavoidable, intrinsic characteristic of contact sports and therefore could not be avoided entirely even with exemplary coaching. Further, as noted above, a likely consequence of allowing negligence liability to extend to organizers and coaches for their negligent conduct leading to negligent play would be that those people would withdraw from organizing and coaching games. When participants would then endeavor to engage in the activities without organization or coaching, they would lack the skill and regard for safety that coaches and organizers would otherwise instill, thus rendering

contact sports even more dangerous. As such, based on all of the considerations stated, we conclude that, under Illinois law, the contact sports exception does extend to coaches and organizers for their negligence leading to risks that are otherwise inherent in the relevant sport.

In reaching this conclusion, we reject an opposing formulation that would hold coaches and organizers liable in negligence even for injury caused by another player's negligence where a defendant coach increased the risk of the negligent conduct. See Foronda v. Hawaii International Boxing Club, 96 Haw. 51, 70, 25 P.3d 826, 845 (2001) (relying on rule from Knight, but concluding, without noting its departure, that liability was precluded because "coaching and supervision during the fatal accident did not *** create a new risk or exacerbate an inherent risk"); Benitez v. New York City Board of Education, 73 N.Y.2d 650, 658, 543 N.Y.S.2d 29, 33, 641 N.E.2d 29, 33 (1989) ("Players who voluntarily join in extracurricular interscholastic sports assume the risks to which their roles expose them but not risks which are 'unreasonably increased or concealed' "). While it may be argued that such coaching negligence constitutes a latent risk incapable of being appreciated by opposing players, the risk of negligent play is no less latent if it comes about solely as a result of an opposing player's lack of skill. Further, as discussed above, a plaintiff is assumed to expect the full continuum of negligence from co-participants, and, whether or not the amount of negligence is increased within the acceptable range, it still falls within the range of expected negligence. It would be strange to hold a coach liable for a player's negligence after reasoning that the plaintiff's risk assumption precludes recovery against the negligent player for the same negligence. Finally, as just stated, holding coaches liable for such negligence would defeat the policy goals (outside of risk assumption principles) the contact sports exception was created to uphold.

The organizational defendants are protected by the contact sports exception to the same extent that the player defendants are protected--that is, they are protected from liability for negligence associated with risks inherent in the sport.

That said, as noted below, we disagree with the organizational defendants' argument that Benjamin assumed the risk of being checked from behind in the manner plaintiff alleges, because Strevell's and Zimmerman's conduct here is alleged to have been willful and wanton and thus beyond the risks inherent in the game. The organizational defendants' argument presupposes the insufficiency of count I of plaintiff's second amended complaint.

For clarity, we note that we hold that the contact sports exception precludes liability only for negligence associated with an injury caused by a risk associated with engaging in a contact sport--i.e., a risk inherent in the sport. It does not insulate defendants from negligence liability for injuries arising from circumstances that are outside the context of physical play and are not inherent in the play of the game. Put another way, a plaintiff cannot circumvent the contact sports exception by alleging simple negligence against the organizers of the sport leading to injury as a result of the manner in which the game was played, but a plaintiff can succeed on a claim of simple negligence leading to injury as a result of, e.g., field design (Ward, 243 Ill. App. 3d 968 (holding that school district could be liable for negligently locating two playing fields almost immediately adjacent to one another)). Of course, a coach's negligence directly leading to injury (as opposed to here, where it is alleged to be an antecedent cause of more direct acts by Strevell and Zimmerman) may fall outside the protection of the contact sports exception where it creates a risk not inherent in the game. The exception also does not protect third parties (such as the organizational defendants here) from claims that their negligence caused a participant to engage in willful and wanton conduct that led to an injury, because

-41-

willful and wanton conduct falls outside the scope of the risks assumed by contact sports participants, beyond the rationale for the contact sports exception stated in Nabozny, and thus outside the scope of the contact sports exception. That said, we note that a plaintiff's subjective assumption of the risk of circumstances not inherent in the play of the game, such as the negligent design of the field, would preclude liability to the extent that it constituted contributory or comparative negligence, even if the bar to recovery could not be labeled as either the "contact sports exception" or assumption of the risk. See T. B. Fitzgerald, The "Inherent Risk" Doctrine, Amateur Coaching Negligence, and the Goal of Loss Avoidance, 99 Nw. U. L. Rev. 889, 903-04 (2005) (players "do not implicitly assume the risks associated with defective athletic equipment [] although they may assume such risks under secondary implied assumption of risk []").

Applying the above rule to the current case, we conclude that the risk here--being checked from behind in the manner plaintiff alleges--may be proven to be one that is not normally associated with hockey play in this league. While the contact sports exception may insulate the organizational defendants from liability based on negligently caused injuries sustained as a result of rough play, the injury here, as discussed above, is alleged to have been the result of willful and wanton conduct. As such, it falls beyond the scope of protection the contact sports exception affords. Because we hold above that plaintiff successfully pled Strevell's and Zimmerman's willful and wanton conduct, we hold that the contact sports exception does not protect the organizational defendants for their negligence leading to the allegedly willful and wanton conduct. However, we note again for clarity that, based on our discussion above, if plaintiff fails on remand to prove Strevell's and Zimmerman's willful and wanton conduct (and thus fails to prove that Benjamin's injury was a result of a risk not inherent in

the game), then the contact sports exception applies to insulate the organizational defendants from negligence liability for any injury caused by Strevell's and Zimmerman's negligence.

A fair reading of plaintiff's complaint leads us to conclude that he alleged that the organizational defendants' negligence caused Strevell's and Zimmerman's allegedly willful and wanton conduct. Though plaintiff does not explicitly say in his complaint that the negligence alleged against the organizational defendants caused willful and wanton conduct by the player defendants, he does state in each of the three counts against the organizational defendants that "[a]s a proximate result of one or more of the *** negligent acts and/or omissions *** [, Benjamin] has suffered *** injuries." Taking this allegation in conjunction with plaintiff's theory of the case--that Strevell's and Zimmerman's conduct was willful and wanton--we read plaintiff's complaint as alleging that the organizational defendants' negligence proximately caused Benjamin's injury by causing the players' allegedly willful and wanton conduct.

The organizational defendants premise their entire argument in support of dismissing counts II, IV, and VI of the second amended complaint on the contact sports exception. Therefore, we do not consider other possible obstacles to the organizational defendants' liability. However, we note that, though game organizers' refuge in the contact sports exception is limited as described above, their liability in these situations may be curtailed by the requirements of proximate causation in cases involving injuries caused by the intervening acts of third parties. The term "proximate cause" describes two distinct requirements: cause in fact and legal cause. Abrams v. City of Chicago, 211 Ill. 2d 251, 258 (2004). A defendant's conduct is a cause in fact of the plaintiff's injury if that conduct is a material element and substantial factor in bringing about the injury. Abrams, 211 Ill. 2d at 258. By contrast, a defendant's conduct is the legal cause of the plaintiff's injury where " 'the injury is of

a type that a reasonable person would see <u>as a likely result</u> of his or her conduct.' " (Emphasis in original.) <u>Abrams</u>, 211 Ill. 2d at 258, quoting <u>First Springfield Bank & Trust v. Galman</u>, 188 Ill. 2d 252, 260 (1999). In a case where the plaintiff's injuries result not from the defendant's negligence directly but from the subsequent, independent act of a third person, then the test is " 'whether the first wrongdoer *** might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence.' " <u>Abrams</u>, 211 Ill. 2d at 259, quoting <u>Galman</u>, 188 Ill. 2d at 257. This principle offers further protection to those in the organizational defendants' situation. The organizational defendants might have argued that, even if they negligently failed to enforce the rules against checking from behind, such negligence led directly only to players' <u>negligent</u> checking from behind, as opposed to players' <u>willfully and wantonly</u> checking from behind, and the additional malfeasance that lifted the act into willful and wanton behavior came independently from the players. Because the organizational defendants do not raise this issue, we do not consider its application to this case. However, we do note that issues of proximate causation and intervening willful and wanton or intentional acts may become relevant as this litigation progresses.

Plaintiff relies on three Illinois cases in arguing that organizers owe to players a duty that defeats the contact sports exception. See <u>Godee v. Illinois Youth Soccer Ass'n</u>, 327 Ill. App. 3d 695 (2002); <u>Loosier v. Youth Baseball & Softball, Inc.</u>, 142 Ill. App. 3d 313 (1986); <u>Lynch v. Board of Education of Collinsville Community Unit District No. 10</u>, 82 Ill. 2d 415 (1980). We disagree with plaintiff's reading of all three cases. In <u>Godee</u>, the plaintiff sued two youth soccer coaches and two youth soccer organizations for injuries she sustained when she slipped and fell in a drainage ditch by a school's field as she walked to the parking lot following her son's practice soccer game. <u>Godee</u>, 327 Ill. App. 3d 695. Likewise, in <u>Loosier</u>, a minor plaintiff sued a baseball organization for failing to

supervise him in order to prevent injuries he sustained when he was struck by a truck while trying to cross an interstate highway. Loosier, 142 Ill. App. 3d 313. Neither of these cases involves an injury a participant sustained as a proximate result of a failure to supervise participation in a contact sport.

In Lynch, our supreme court considered a case in which a plaintiff student was injured during a female "powder-puff" tackle football game that the court held to be a school activity. Lynch, 82 Ill. 2d 415. The supreme court affirmed a verdict finding the defendant school district liable for failing to provide protective equipment to the participants. However, as the organizational defendants point out, liability in that case was premised not on a general duty of care but instead on a statute providing that teachers and educational employees stood " 'in the relation of parents and guardians' " to the children in all school activities. Lynch, 82 Ill. 2d at 424, quoting Ill. Rev. Stat. 1973, ch. 122, par. 24--24.

Thus, plaintiff's cases do not sway us from our above-stated conclusion regarding the application of the contact sports exception to sports coaches and organizers. However, because plaintiff may be able to establish that the organizational defendants' negligence led to willful and wanton play causing Benjamin's injury, we reverse the trial court's dismissal of counts II, IV, and VI of plaintiff's second amended complaint.

Plaintiff's third appellate argument is that the trial court erred in dismissing counts III, V, and VII of the second amended complaint for failing to allege willful and wanton conduct by NCRHA, AHAI, and IHOA. The relevant standards for stating a claim premised on willful and wanton conduct are discussed above. Plaintiff admittedly repeated his allegations from the negligence counts against the organizational defendants in attempting to plead willful and wanton conduct, but plaintiff asserts that he has alleged facts sufficient to meet both standards. We disagree. Plaintiff's essential

contention regarding all three organizational defendants is that they failed to enforce hockey safety rules sufficiently, and that this failure led to, and perhaps encouraged, Strevell's and Zimmerman's allegedly improper conduct, which caused Benjamin's injury. While we do not dispute plaintiff's assertion that omissions or failures to act can constitute willful and wanton conduct (see, e.g., Carter v. New Trier East High School, 272 Ill. App. 3d 551 (1995)), we hold that the omissions and failures alleged here, even if proven, would not amount to willful and wanton conduct. Plaintiff attempts to characterize the organizational defendants' actions as "encouragement" of acts in violation of the safety rules, and plaintiff then argues that "it can hardly be said that an organization's promotion or encouragement of an action in violation of a safety rule" is not willful and wanton. However, the alleged encouragement comes only from IHOA's failure to strictly enforce the relevant hockey rules and the other organizations' failure to compel IHOA to strictly enforce the rules. We reject plaintiff's characterization and consider only the factual allegations of the complaint. Even taking those allegations as true, they raise no inference that the organizational defendants' failure to act was undertaken with an intention to harm or an utter indifference or conscious disregard for Benjamin's welfare. Accordingly, we affirm the trial court's dismissal of counts III, V, and VII of plaintiff's second amended complaint.

Plaintiff's fourth appellate argument is that the trial court erred in dismissing count VIII of the third amended complaint for failing to state a claim of civil conspiracy between AHAI and IHOA. Civil conspiracy consists of (1) an agreement between two or more persons (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, and (3) some tortious or illegal act by a party to the agreement in furtherance of the agreement. Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 62-63 (1994). The function of a conspiracy

claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged the wrongdoer's acts. Adcock, 164 Ill. 2d at 62.

AHAI and IHOA challenge all three elements here. AHAI and IHOA argue that plaintiff failed to allege facts suggesting that AHAI and IHOA entered into an agreement not to call penalties for checking from behind, because plaintiff's third amended complaint actually alleges that AHAI engaged in conduct designed to encourage IHOA to call checking from behind violations. Indeed, paragraph 12 of the third amended complaint alleges that AHAI changed its rules to increase the penalty for checking from behind. AHAI and IHOA also note that plaintiff's allegations are "dispelled by plaintiff's own allegation *** that each *** jersey had sewn on the back the warning 'STOP'." However, each of their arguments points to a potential factual issue, and the presence of a factual issue militates against dismissing count VIII before discovery.

AHAI and IHOA also argue that plaintiff has not sufficiently alleged an agreement between AHAI and IHOA, because he alleged only AHAI's knowledge of IHOA's failure to call checking from behind penalties, and "knowledge of the fraudulent or illegal actions of another is *** not enough to show a conspiracy." McClure v. Owens Corning Fiberglass Corp., 188 Ill. 2d 102, 134 (1999). However, plaintiff alleges not only that AHAI was aware of IHOA's failure to call the penalties, but also that the two organizations "agreed to not enforce the aforesaid checking from behind rule during games that occurred under the authority of the rule of *** AHAI." Taking this factual allegation as true, we hold that plaintiff has adequately alleged an agreement between AHAI and IHOA.

AHAI and IHOA next challenge the sufficiency of plaintiff's allegations to support the second element of a conspiracy claim: that AHAI and IHOA held an unlawful purpose or a lawful purpose to be accomplished by unlawful means. AHAI and IHOA argue that IHOA's decision on whether to

enforce rules during a hockey game is not unlawful. As discussed above, plaintiff has successfully alleged that IHOA may be liable in tort for the allegedly willful and wanton injurious conduct resulting from its negligence in failing to enforce the relevant hockey safety rules. Therefore, to the extent that plaintiff is able to prove that liability, he will be able to prove that the purpose of the agreement he alleges between AHAI and IHOA was tortious, i.e., unlawful. Moreover, "[o]nce a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent." (Emphasis added.) Adcock, 164 Ill. 2d at 64.

Again, at this point, we note that AHAI and IHOA have not raised any argument regarding proximate causation--AHAI and IHOA do not argue that they did not or could not foresee, at the time of their alleged agreement, that Strevell's and Zimmerman's allegedly willful and wanton acts would come about as a result of AHAI and IHOA's alleged agreement. Such an argument would bear on the illegality of the alleged agreement. AHAI and IHOA could argue that, if the intervening willful and wanton acts were not foreseeable at the time of their agreement, their agreement not to enforce a rule was not, by itself, an agreement to commit a tortious act, because a failure to enforce a rule, even if negligent, is not necessarily tortious in this context. If plaintiff fails to demonstrate this proximate causation as this case moves forward, then the conspiracy charge will necessarily fail.

Finally, AHAI and IHOA argue that plaintiff has not alleged an overt tortious act on the part of AHAI or IHOA, because "[p]laintiff was allegedly checked from behind by his fellow hockey players and *** [that was] not the act of either AHAI or IHOA." However, the relevant potentially

tortious act under the conspiracy count is not Strevell's and Zimmerman's checking of Benjamin, but IHOA's potentially negligent failure to enforce the applicable hockey safety rules.

For the reasons given, we reverse the judgment of the circuit court of Du Page County as to counts I, II, IV, and VI of plaintiff's second amended complaint, and we reverse the dismissal of count VIII of the third amended complaint. We affirm the dismissal of counts III, V, and VII of plaintiff's second amended complaint.  We remand the cause.

Reversed and remanded.

HUTCHINSON, J., concurs.

JUSTICE KAPALA, concurring in part and dissenting in part:

I concur with the majority's decisions to reverse the trial court's dismissal of count I of plaintiff's second amended complaint and to affirm the trial court's dismissal of counts III, V, and VII of plaintiff's second amended complaint.  However, I cannot agree that plaintiff has alleged the facts necessary to support his claims of negligence against the NCRHA, the AHAI, and the IHOA, or that plaintiff has properly pleaded a cause of action for civil conspiracy.  Therefore, I respectfully dissent from the majority's decision to reverse the trial court's dismissal of counts II, IV, and VI of plaintiff's second amended complaint and count VIII of plaintiff's third amended complaint.  I will first address plaintiff's claims of negligence against the organizational defendants (counts II, IV and VI) and then proceed to confront the insufficiency of plaintiff's civil conspiracy claim against the AHAI and the IHOA.

I agree with the majority's conclusion that the contact sports exception applies to sports organizations and that, as a result, these organizations have no legal duty to eliminate risks inherent in the sport itself, such as other players' negligent conduct.  I also agree with the majority that sports

organizers have a duty not to increase the risks to a participant over and above those inherent in the sport and that this includes a duty not to cause willful and wanton conduct of the players towards one another. However, none of plaintiff's claims of negligence against the organizational defendants alleges facts sufficient to show any connection between the alleged actions and omissions of the organizational defendants and the alleged willful and wanton conduct of Strevell and Zimmerman.

In counts II, IV, and VI of his second amended complaint, plaintiff alleges that the organizational defendants were negligent in various ways, including failing to supervise, instruct, and discipline players, officials, and teams in regard to checking from behind, and by promoting, encouraging, and condoning checking from behind. However, plaintiff alleges only that the organizational defendants caused Benjamin's injuries. Plaintiff does not allege facts showing how the actions of the organizational defendants caused Strevell's and Zimmerman's alleged reckless disregard for Benjamin's safety. In fact, plaintiff does not allege that the actions of the organizational defendants had any effect on the players, but only that their actions caused Benjamin's injuries.

The majority suggests that "a fair reading of plaintiff's complaint leads us to conclude that he alleged that the organizational defendants' negligence caused Strevell's and Zimmerman's allegedly willful and wanton conduct." Slip op. at 43. I disagree. Although pleadings must be liberally construed in the light most favorable to the plaintiff, the failure to plead facts cannot be aided by any principle of liberal construction. Doe v. Chicago Board of Education, 213 Ill. 2d 19, 28 (2004). Plaintiff does not plead any facts to show how the organizational defendants' failure to promote the rule against checking from behind caused the actions of Strevell and Zimmerman. Even aside from the organizational defendants' specific effect on Strevell and Zimmerman, plaintiff never alleges any facts generally showing how the organizational defendants increased the risk of the players' reckless

disregard for the safety of other players above and beyond violating the rules of the game. Plaintiff's complaint at most suggests that the organizational defendants facilitated an environment that would cause players to break the rule against checking from behind. As the majority points out, another player's breach of the rules of the game is an inherent risk that sports organizations have no duty to prevent. Therefore, in order to be negligent, the sports organization must do something more than facilitate an inherent risk in the game. Plaintiff alleges no facts to show how the organizational defendants' actions caused Strevell and Zimmerman to act with reckless disregard for Benjamin's safety, and thus there is no factual link in the complaint between the organizational defendants' actions and Strevell's and Zimmerman's willful and wanton conduct that would support a claim of negligence on the part of the organizational defendants. Consequently, in my view, the trial court correctly dismissed counts II, IV, and VI of plaintiff's second amended complaint.

For similar reasons, the trial court also correctly dismissed count VIII of plaintiff's third amended complaint, in which he alleged that the AHAI and the IHOA engaged in a civil conspiracy. Although I agree with the majority that plaintiff has alleged that the AHAI and the IHOA made an agreement, I do not agree that plaintiff alleged facts showing that the AHAI and the IHOA made their agreement for the purpose of accomplishing an unlawful act or a lawful act by unlawful means, or that the AHAI and the IHOA committed a tortious act in furtherance of that agreement.

The majority concludes that plaintiff has successfully alleged that the AHAI and the IHOAs' agreement not to enforce the rule had an unlawful purpose, because plaintiff has successfully alleged that the IHOA's failure to enforce the rule was negligent. Initially, I question whether an agreement to commit a negligent act satisfies the requirement that a defendant knowingly and voluntarily

participate in a common scheme to accomplish an unlawful purpose or a lawful purpose by unlawful means (Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 64 (1994)).

> "Since one cannot agree, expressly or tacitly, to commit a wrong about which he or she has no knowledge, in order for civil conspiracy to arise, the parties must be aware of harm or wrongful conduct at beginning of combination or agreement. Thus, civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong and, because negligence is, by definition, not an intentional wrong, the parties cannot engage in civil conspiracy to be negligent." 16 Am Jur. 2d Conspiracy §51 (1998).

See also Lenahan v. University of Chicago, 348 Ill. App. 3d 155, 165 (2004).

However, even assuming that plaintiff could show that agreeing to commit a negligent act satisfies the requirement that co-conspirators knowingly participated in a common scheme to commit an unlawful act, plaintiff has not alleged a tortious act in furtherance of the scheme. First, plaintiff never alleges that, following the agreement with the AHAI, the IHOA carried out the agreement by failing to enforce the rule against checking from behind in any AHAI games. However, even liberally inferring from the complaint that as a result of the agreement the IHOA failed to enforce the rule, as discussed above I do not agree that plaintiff alleged facts to show that the IHOA's failure to enforce the rule was negligent. **To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful. Adcock, 164 Ill. 2d at 63.** Because we have concluded that a sports organization does not breach its duty to a player when its conduct causes an injury that occurs as a result of another player breaking the rules, but only when it causes harm resulting from another player's willful and wanton conduct, an organization's failure to enforce the rules, in itself, does not

constitute negligence on the part of the organization. Plaintiff has failed to allege facts to connect the IHOA's failure to enforce the rule with Strevell's and Zimmerman's willful and wanton conduct, and thus has not alleged negligent conduct on the part of the IHOA. Therefore, plaintiff has not alleged a tortious act in furtherance of the alleged agreement and has not pleaded all the elements of civil conspiracy. As a result, I believe that plaintiff's claim of civil conspiracy was properly dismissed.

For the foregoing reasons, I respectfully dissent from the judgment of the majority reversing the trial court's dismissal of counts II, IV, and VI of plaintiff's second amended complaint and count VIII of plaintiff's third amended complaint.