Docket Nos. 104123, 104133 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

ROBERT KARAS, Appellee, v. JOSEPH STREVELL *et al.*, Appellants.

*Opinion filed February 22, 2008.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman, and Karmeier concurred in the judgment and opinion.

Justice Kilbride specially concurred, with opinion.

## OPINION

Plaintiff, Robert Karas, filed a complaint on behalf of his minor son, Benjamin Karas, alleging that Benjamin was injured while playing in an organized ice hockey game when he was bodychecked from behind by two opposing players. The complaint alleged that the opposing players' conduct was willful and wanton, and further alleged that the opposing players' team, the governing association of the officials who refereed the game, and the amateur hockey league to which the opposing teams belonged, had both negligently, and willfully and wantonly, caused the injury. In addition, the complaint alleged a civil conspiracy between the hockey league and officials'

associations to forgo enforcing a rule against bodychecking players from behind.

Both the player and organizational defendants filed motions to dismiss pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2004)). The circuit court of Du Page County, relying primarily on the contact sports exception adopted by this court in *Pfister v. Shusta*, 167 Ill. 2d 417 (1995), dismissed plaintiff's complaint in its entirety.

On appeal, the appellate court reversed in part and affirmed in part. 369 Ill. App. 3d 884. The court concluded that plaintiff had successfully pled willful and wanton conduct on the part of the player defendants, had successfully pled negligence on the part of the organizational defendants, and had successfully pled a civil conspiracy. However, the appellate court affirmed the circuit court's dismissal of plaintiff's allegations of willful and wanton conduct against the organizational defendants.

For the reasons that follow, we reverse that portion of the appellate court judgment which allowed the claims of willful and wanton conduct on the part of the player defendants, and negligence and civil conspiracy on the part of the organizational defendants, to go forward. We affirm that portion of the appellate court judgment which dismissed the allegations of willful and wanton conduct against the organizational defendants. We also remand the cause to the circuit court with instructions.

## BACKGROUND

The following facts are taken from plaintiff's second amended complaint. In January of 2004, Benjamin Karas was a member of the Barrington High School Hockey Club's junior varsity hockey team. Russell Zimmerman and Joseph Strevell, the player defendants, were members of a junior varsity hockey team run by defendant Naperville Central Redhawk Hockey Association (Redhawk Hockey). Both teams were members of a hockey league, defendant Amateur Hockey Association Illinois, Inc. (the Hockey Association), and were governed by hockey rules which the Hockey Association promulgated. One of these rules was a prohibition against bodychecking players from behind.

On January 25, 2004, the Barrington team played the Naperville team in an organized ice hockey game. The game was refereed by

officials with defendant Illinois Hockey Officials Association (the Officials Association). On the back of each player's jersey the word "STOP," had been sewn above or between the player's number to reinforce the rule against bodychecking players from behind. According to plaintiff's complaint, during the game, the player defendants struck Benjamin "from behind on his back area causing his head to strike the boards resulting in serious personal injury, including neck and head injuries."

On September 14, 2004, plaintiff filed an eight-count, second amended complaint in the circuit court of Du Page County. Count I of the complaint alleged that Benjamin's injuries were caused by the player defendants' willful and wanton conduct. The complaint states:

"10. On January 25, 2004, the Unknown Defendants, JOSEPH STREVELL and RUSSELL ZIMMERMAN, showed willful and wanton disregard for the safety of the Minor Plaintiff, BENJAMIN S. KARAS, in one or more of the following ways:

a. Struck the Minor Plaintiff from behind when he was in such a position that they knew or should have known of the possibility of inflicting serious injury on him;

b. Struck the Minor Plaintiff from behind when he was in close proximity to the boards [such] that they knew or should have known of the possibility of inflicting serious injury on him;

c. Struck the Minor Plaintiff from behind when he was in such a position and close proximity to the boards that they knew or should have known of the possibility of inflicting serious injury on him;

d. 'Back checked'[1] the Minor Plaintiff at a time when he was partially bent over and looking down with his head pointing towards the boards;

---

[1]Plaintiff uses the term "back check" in his complaint when he evidently means "body check from behind." To "back-check" is "to skate back towards one's own goal covering the rushes of opposing players in a hockey game." Webster's Third New International Dictionary 158 (1993). A "body check," on the other hand, is "a blocking of an opponent with the body in ice hockey and lacrosse." Webster's Third New International Dictionary 246 (1993).

e. Failed to refrain from 'back checking' the Minor Plaintiff in violation of contest rules;

f. Were otherwise reckless."

Counts II, IV, and VI of the second amended complaint alleged negligence on the part of Redhawk Hockey, the Hockey Association, and the Officials Association. Count II alleged that Redhawk Hockey "failed to instruct its players" to refrain from bodychecking opposing players from behind; "failed to discipline, sanction or otherwise control its players" who were known to bodycheck from behind; "promoted, encouraged or otherwise condoned its players" to bodycheck from behind; and "failed to supervise the activities of its players."

Count IV of the second amended complaint alleged that the Hockey Association "failed to instruct its authorized member teams to refrain their players" from bodychecking from behind; "failed to instruct [the Officials Association] to strictly enforce" the rule against bodychecking from behind; "failed to discipline, sanction or otherwise control" both Redhawk Hockey and the Officials Association; "promoted, encouraged or otherwise condoned" bodychecking from behind; and "failed to supervise" both Redhawk Hockey and the Officials Association.

Count VI alleged that the Officials Association "failed to strictly enforce" the rule against bodychecking from behind; "failed to discipline, sanction or otherwise control its member officials regarding their known failures to strictly enforce" the rule against bodychecking from behind; "promoted, encouraged or otherwise condoned its member officials to fail to strictly enforce" the rule against bodychecking from behind; and "failed to supervise the activities of its member officials."

Counts III, V, and VII of plaintiff's second amended complaint repeated the allegations found in counts II, IV, and VI verbatim. However, instead of alleging negligence, counts III, V, and VII alleged, respectively, that Redhawk Hockey, the Hockey Association, and the Officials Association "showed willful and wanton disregard for the safety of" Benjamin Karas.

Finally, count VIII of plaintiff's second amended complaint alleged that there was a civil conspiracy between the Hockey Association and

the Officials Association "not to enforce" the rule against bodychecking from behind, and that this conspiracy caused Benjamin's injury.

The player and organizational defendants moved to dismiss plaintiff's second amended complaint pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2004)). On March 14, 2005, the circuit court granted the motions filed by the player defendants and dismissed count I of the second amended complaint.

On July 1, 2005, the circuit court dismissed the remaining counts of the complaint. In a written order, the circuit court explained the reasons for the dismissals, including the previous dismissal of count I. With respect to count I, the court noted the rule, adopted by this court in *Pfister v. Shusta*, 167 Ill. 2d 417 (1995), that a plaintiff who is injured by a coparticipant while engaged in a contact sport may only recover if the injury was the result of intentional or willful and wanton conduct. The circuit court concluded that the ice hockey game at issue was a contact sport, and that plaintiff had failed to plead willful and wanton conduct on the part of the player defendants.

With respect to counts II, IV, and VI, the negligence counts directed against Redhawk Hockey, the Hockey Association and the Officials Association, the court concluded that "no duty of care exists in Illinois for claims arising out of negligence in high school contact sports." Accordingly, the circuit court dismissed these counts.

The court also dismissed counts III, V, and VI for failing to allege willful and wanton conduct on the part of the organizational defendants. The court noted, however, that in counts III and V plaintiff alleged that Redhawk Hockey and the Hockey Association had "promoted, encouraged or otherwise condoned players" to bodycheck from behind. The circuit court observed that actively encouraging a player to violate the rules went beyond mere negligence, but also found that, as pled, plaintiff's allegations of active encouragement were conclusory and did not state a cause of action. The court then granted plaintiff leave to amend counts III and V to allege facts, if supported by reasonable inquiry under Supreme Court Rule 137, that Redhawk Hockey and the Hockey Association had actively encouraged players to violate the rule against bodychecking from behind. Thereafter, plaintiff did not amend counts III and V and counsel for plaintiff subsequently stated to the circuit court, "[W]e

have no facts that would–that we could plead right now, pursuant to [Supreme Court Rule] 137, that would establish that any of these organizations encouraged actively–in other words, that they instructed the players to violate this rule [against bodychecking from behind]."

In its order of July 1, 2005, the circuit court also dismissed count VIII, the count alleging civil conspiracy, but granted leave to plaintiff to replead the count with more specificity. Plaintiff subsequently filed a third amended complaint that amended count VIII and listed each of the previously dismissed counts. As repled, count VIII again alleged that the Hockey Association and the Officials Association "agreed not to enforce the *** checking from behind rule during games that occurred under the authority of the rule of the [Hockey Association]."

On November 7, 2005, the circuit court granted the Hockey Association and Officials Association's section 2–615 motion to dismiss count VIII. Regarding this count, the court noted that the principal issue was whether the failure to strictly call the penalty of checking from behind was a concerted action for an unlawful purpose. The circuit court stated that it "couldn't find any authority" which held that the failure to strictly call a penalty amounted to an unlawful purpose in a conspiracy claim. Accordingly, the court dismissed count VIII and entered a final judgment as to all counts.

On appeal, the appellate court reversed the trial court's dismissal of counts I, II, IV, VI, and VIII and affirmed the trial court's dismissal of counts III, V, and VII. 369 Ill. App. 3d 884. With respect to the player defendants, the appellate court held that plaintiff had adequately pled willful and wanton conduct and, in particular, a "conscious disregard for [plaintiff's] safety":

"Plaintiff alleged not only that Strevell and Zimmerman broke the rules of hockey, but that they broke a rule of such special emphasis that players' jerseys were altered to reinforce it. Plaintiff also alleged circumstances surrounding Strevell's and Zimmerman's actions–they allegedly checked Benjamin when he was defenseless and in a position of acute vulnerability–that evince a conscious disregard for his safety. These allegations taken as true create an inference that Strevell's and Zimmerman's actions exceeded those acceptable during the excitement of play and were so reckless that they were likely to cause, and indeed did cause, injury to another. Therefore,

-6-

we conclude that the first count of plaintiff's complaint should be reinstated so that he has an opportunity to prove the truth of the allegations." 369 Ill. App. 3d at 891-92.

With respect to the organizational defendants, the appellate court affirmed the circuit court's dismissal of counts III, V, and VII, the counts alleging willful and wanton conduct, but reversed the dismissal of counts II, IV, and VI, the counts alleging negligence, and reversed the dismissal of count VIII, the count alleging civil conspiracy.

Regarding the negligence counts, the appellate court concluded that the contact sports exception may apply, as a general matter, to nonparticipant defendants, but that the exception did not apply in this case. The court stated:

> "While the contact sports exception may insulate the organizational defendants from liability based on negligently caused injuries sustained as a result of rough play, the injury here, as discussed above, is alleged to have been the result of willful and wanton conduct. As such, it falls beyond the scope of protection the contact sports exception affords. Because we hold above that plaintiff successfully pled Strevell's and Zimmerman's willful and wanton conduct, we hold that the contact sports exception does not protect the organizational defendants for their negligence leading to the allegedly willful and wanton conduct." 369 Ill. App. 3d at 916.

Accordingly, the appellate court reversed the trial court's dismissal of the negligence counts against the organizational defendants. 369 Ill. App. 3d at 915-16.

Regarding the willful and wanton counts against the three organizational defendants, however, the appellate court affirmed the trial court's dismissal, stating:

> "Plaintiff's essential contention regarding all three organizational defendants is that they failed to enforce hockey safety rules sufficiently, and that this failure led to, and perhaps encouraged, Strevell's and Zimmerman's allegedly improper conduct, which caused Benjamin's injury. While we do not dispute plaintiff's assertion that omissions or failures to act can constitute willful and wanton conduct [citation], we hold that the omissions and failures alleged here, even if

proven, would not amount to willful and wanton conduct." 369 Ill. App. 3d at 918.

Finally, the appellate court reversed the circuit court's dismissal of count VIII, the count alleging a civil conspiracy between the Hockey Association and the Officials Associations to forgo enforcing the prohibition against bodychecking from behind. Key to this holding was the appellate court's determination that plaintiff had successfully pled that the Hockey Association and the Officials Association had an unlawful purpose:

> "As discussed above, plaintiff has successfully alleged that [the Officials Association] may be liable in tort for the allegedly willful and wanton injurious conduct resulting from its negligence in failing to enforce the relevant hockey safety rules. Therefore, to the extent that plaintiff is able to prove that liability, he will be able to prove that the purpose of the agreement he alleges between [the Hockey Association] and [the Officials Association] was tortious, *i.e.*, unlawful." 369 Ill. App. 3d at 920.

Justice Kapala dissented in part. Although Justice Kapala agreed that the claims against the player defendants should go forward, he disagreed with the majority's decision to allow the claims of negligence and civil conspiracy against the organizational defendants to proceed. 369 Ill. App. 3d at 921-24 (Kapala, J., concurring in part and dissenting in part).

We granted the player and organizational defendants' petitions for leave to appeal and consolidated the cases for review. Plaintiff has cross-appealed the appellate court's judgment affirming the dismissal of the counts of willful and wanton conduct against the organizational defendants.

We have granted leave to USA Hockey, Inc., and the Illinois Association of Defense Counsel to file *amicus curiae* briefs. The Illinois Trial Lawyers Association also sought leave to file an *amicus curiae* brief that urges the affirmance of the appellate court and contends, *inter alia*, that this court should abandon fact pleading in favor of notice pleading. Defendants have filed a joint motion to strike the brief, contending that the fact-pleading doctrine is not at issue.

"This court has repeatedly rejected attempts by *amicus* to raise issues not raised by the parties to the appeal." *Burger v. Luther General Hospital*, 198 Ill. 2d 21, 62 (2001), citing *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 30 (1992); *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 117 (1990). " '[A]n *amicus* takes the case as he finds it, with the issues framed by the parties.' " *Burger*, 198 Ill. 2d at 62, quoting *People v. P.H.*, 145 Ill. 2d 209, 234 (1991). No party to this case has argued for the elimination of fact pleading. Accordingly, defendants' motion to strike is granted with respect to that portion of the *amicus* brief which urges this court to abandon fact pleading. The remainder of the brief is allowed.

## ANALYSIS

A motion to dismiss brought under section 2–615 of the Code of Civil Procedure tests the legal sufficiency of the complaint. On review, the question is "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004); *Jarvis v. South Oak Dodge, Inc.*, 201 Ill. 2d 81, 86 (2002). The standard of review is *de novo*. *Vitro*, 209 Ill. 2d at 81.

### Player Defendants

In general, every person owes a duty of ordinary care to guard against injuries to others. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 291 (2007). A person who breaches this duty is deemed negligent and may be held financially liable if his conduct proximately causes injury to another. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). However, in *Pfister v. Shusta*, 167 Ill. 2d 417 (1995), this court adopted an exception to the standard of ordinary care for participants engaged in contact sports. Under this exception, a participant in a contact sport may not be held liable for negligent conduct which injures a coparticipant. Instead, liability will arise only if a participant intentionally, or willfully and wantonly, injures a coparticipant. Stated otherwise, in a contact sport the duty owed by

a participant to a fellow participant is the "duty to refrain from willful and wanton or intentional misconduct." *Pfister*, 167 Ill. 2d at 420.

*Pfister* explained the rationale for limiting participants' liability in contact sports:

> "The contact sports exception strikes the appropriate balance between society's interest in limiting liability for injuries resulting from physical contact inherent in a contact sport and society's interest in allowing recovery for injuries resulting from willful and wanton or intentional misconduct by participants. Those who participate in soccer, football, softball, basketball, or even a spontaneous game of can kicking, choose to play games in which physical contact among participants is inherent in the conduct of the game. Participants in such games assume a greater risk of injury resulting from the negligent conduct of coparticipants. ***
>
>           * * *
>
>   *** The contact sports exception allows recovery for injuries resulting from willful and wanton and intentional misconduct while taking into account the voluntary nature of participation in games where physical contact is anticipated and where the risk of injury caused by this contact is inherent." *Pfister*, 167 Ill. 2d at 426-27.

See also *Azzano v. Catholic Bishop of Chicago*, 304 Ill. App. 3d 713, 718 (1999) ("the public policy underlying the contact sports exception today is the need to strike a balance between protecting participants in sporting activities and the voluntary nature of participation in games where physical contact is inherent and inevitable").

*Pfister* also noted that a rule limiting the liability of participants in contact sports was necessary to avoid a chilling effect on the way these sports are played. As the court observed, if a negligence standard were imposed on participants, contact sports would be fundamentally altered or, perhaps, eliminated altogether. *Pfister*, 167 Ill. 2d at 427, quoting *Pfister v. Shusta*, 256 Ill. App. 3d 186, 191-92 (1994) (Green, J., dissenting). Numerous other courts have voiced the same concern and have stated that a primary justification for limiting liability in the sports context is to avoid fundamentally altering, or discouraging participation in, the sport at issue. See, *e.g.*, *Knight v.*

*Jewett*, 3 Cal. 4th 296, 318, 834 P.2d 696, 710, 11 Cal. Rptr. 2d 2, 16 (1992) ("vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct"); *Ross v. Clouser*, 637 S.W.2d 11, 14 (Mo. 1982) ("Fear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation"); *Bowman v. McNary*, 853 N.E.2d 984, 992 (Ind. App. 2006).

In addition, several courts have recognized a need for a rule limiting liability in the sports context in order to avoid a flood of litigation. As one court has stated:

> "If simple negligence were adopted as the standard of care, every punter with whom contact is made, every midfielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted. *** [T]here exists the potential for a surfeit of lawsuits when it becomes known that simple negligence, based on an inadvertent violation of a contest rule, will suffice as a ground for recovery for an athletic injury. This should not be encouraged." *Jaworski v. Kiernan*, 241 Conn. 399, 409-10, 696 A.2d 332, 338 (1997).

See also *Savino v. Robertson*, 273 Ill. App. 3d 811, 818 (1995) ("the practical effect of applying an ordinary negligence standard would be to open a legal Pandora's box, allowing virtually every participant in a contact sport, injured by another during a 'warm-up' or practice, to bring an action based on the risks inherent in virtually every contact sport. This is exactly the type of result the courts have sought to avoid").

Importantly, although *Pfister* referred to the contact sports exception in terms of the risks assumed by the plaintiff (*Pfister*, 167 Ill. 2d at 426), the exception is not an affirmative defense, nor does it require the court to determine the plaintiff's subjective awareness of the risks associated with the sport. Rather, the contact sports exception is an objective doctrine that defines the scope of the defendant's duty. See Restatement (Third) of Torts: Apportionment of Liability §2, Comment *j*, at 27 (2000) ("What courts often call

'primary assumption of risk' is actually a doctrine about the defendant's liability or duty"); *Barrett v. Fritz*, 42 Ill. 2d 529, 535 (1969) (assumption of the risk concepts are generally duplicative of other doctrines, including scope of duty); *Davenport v. Cotton Hope Plantation Horizontal Property Regime*, 333 S.C. 71, 80-81, 508 S.E.2d 565, 570 (1998); *Perez v. McConkey*, 872 S.W.2d 897, 902 (Tenn. 1994); *Turcotte v. Fell*, 68 N.Y.2d 432, 437-39, 502 N.E.2d 964, 967-68, 510 N.Y.S.2d 49, 52-53 (1986).

When deciding whether the contact sports exception applies, the court must consider the nature of the sport at issue and determine, based on its inherent risks, whether it is a contact sport. When the court concludes that "physical contact among participants is inherent" in the game (*Pfister*, 167 Ill. 2d at 425), a player owes no duty to a coparticipant to avoid ordinary negligence. See, *e.g.*, *Landrum v. Gonzalez*, 257 Ill. App. 3d 942, 947 (1994) (whether a particular case is subject to the contact sports exception "is properly resolved by examining the objective factors surrounding the game itself, not on the subjective expectations of the parties"); see generally *Knight*, 3 Cal. 4th at 315, 834 P.2d at 708, 11 Cal. Rptr. 2d at 14 (a court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to that sport in order to determine whether the defendant owes a duty to protect a plaintiff from the particular risk of harm).

In the case at bar, there is no dispute regarding the nature of the sport at issue. The parties agree that ice hockey, played in a game in which bodychecking is permitted, is a contact sport. Thus, pursuant to *Pfister*, the duty owed by the player defendants to Benjamin was the "duty to refrain from willful and wanton or intentional misconduct." *Pfister*, 167 Ill. 2d at 420.

*Pfister* defined willful and wanton conduct as "a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety or property of others." *Pfister*, 167 Ill. 2d at 421, citing *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 273 (1994). The appellate court below concluded that plaintiff had pled conduct on the part of the player defendants that met this standard. According to the appellate court, because plaintiff

alleged that the player defendants knowingly violated a rule against bodychecking from behind, and because they knew that Benjamin was in a position near the edge of the rink, or boards, when he was struck, plaintiff sufficiently pled a "conscious disregard" of Benjamin's safety by the player defendants. 369 Ill. App. 3d at 892. Before this court, plaintiff repeats this line of reasoning.

We note that *Pfister* did not consider the application of the traditional willful and wanton standard to full-contact sports such as ice hockey and tackle football where physical contact between players is not simply an unavoidable byproduct of vigorous play, but is a fundamental part of the way the game is played. In these sports, holding participants liable for consciously disregarding the safety of coparticipants is problematic.

Striking or bodychecking a person who is standing on two thin metal blades atop a sheet of ice is an inherently dangerous action. Even a cleanly executed body check, performed according to the rules of ice hockey, evinces a conscious disregard for the safety of the person being struck. Yet, in an ice hockey game where bodychecking is permitted, players are struck throughout the game. This conduct is an inherent, fundamental part of the sport. Similarly, in tackle football players must necessarily disregard the risk of injury to others, simply because of the way the game is played:

> "The playing of football is a body-contact sport. The game demands that the players come into physical contact with each other constantly, frequently with great force. The linemen charge the opposing line vigorously, shoulder to shoulder. The tackler faces the risk of leaping at the swiftly moving legs of the ball-carrier and the latter must be prepared to strike the ground violently. Body contacts, bruises, and clashes are inherent in the game. There is no other way to play it." *Vendrell v. School District No. 26C*, 233 Or. 1, 15, 376 P.2d 406, 412 (1962).

In full-contact sports such as tackle football, and ice hockey where bodychecking is permitted, a conscious disregard for the safety of the opposing player is an inherent part of the game. D. Lazaroff, *Torts & Sports*, 7 U. Miami Ent. & Sports L. Rev. 191, 213 ("The infliction of pain with the knowledge of danger is inherent in certain sports such as football and hockey").

A standard of care that holds a player liable based on conduct that is inherent in the sport is contrary to the underlying rationale of *Pfister*. As noted, the rule announced in *Pfister* is based on the long-standing principle that certain sports contain inherent risks for which a defendant owes no duty of care. *Pfister*, 167 Ill. 2d at 426-27; see also *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 166 N.E. 173 (1929) (Cardozo, J.). Although they evince a conscious disregard for the safety of other players, bodychecking and tackling are an inherent part of the sports of ice hockey and football. Pursuant to *Pfister*, a participant has no duty to avoid such conduct.

Morever, imposing liability under the conscious disregard of safety standard would have a pronounced chilling effect on full-contact sports such as ice hockey and football. If liability could be established every time a body check or tackle resulted in injury–because that conduct demonstrates a conscious disregard for the safety of the opposing player–the games of ice hockey and football as we know them would not be played. *Pfister*, 167 Ill. 2d at 427, quoting *Pfister*, 256 Ill. App. 3d at 191-92 (Green, J., dissenting).

Finally, the conscious disregard of safety standard is unfair to defendants in full-contact sports such as ice hockey. As one commentator has noted, ice hockey, like football, is an example of a sport "in which body checking and physical play may foreseeably result in frequent injuries. It would be \*\*\* unjust to predicate participant liability upon the participant's knowledge that a tough check or collision could result in injury. This type of conduct is inherent in the sport itself." 7 U. Miami Ent. & Sports L. Rev. at 214.

In full-contact sports, such as ice hockey where bodychecking is allowed, and tackle football, the traditional willful and wanton standard is both unworkable and contrary to the rationale underlying *Pfister*. To remain consistent with the reasoning of *Pfister*, a standard of care must be employed that more accurately accounts for the inherent risks associated with these sports.

In considering the appropriate standard of care to be followed, we note that a majority of courts have concluded that "rules violations are inherent and anticipated aspects of sports contests" and, thus, insufficient to establish liability by themselves. T. Davis, *Avila v. Citrus Community College District: Shaping the Contours of Immunity and Primary Assumption of the Risk*, 17 Marq. Sports L.

Rev. 259, 274 (2006). As this court observed in *Pfister*, in numerous sports,

> " 'players regularly commit contact beyond that which is permitted by the rules even as applied. In basketball, such an illegal contact is described as a foul for which a sanction is imposed. Sometimes the player fouled is injured. This is to be expected.' " *Pfister*, 167 Ill. 2d at 427, quoting *Pfister*, 256 Ill. App. 3d at 191-92 (Green, J., dissenting).

See also *Lang v. Silva*, 306 Ill. App. 3d 960, 968-69 (1999) ("even in sports where there are rules governing the permissible degree of physical contact, rule infractions are inevitable and justify a lower standard of care than ordinary negligence"); *Jaworski*, 241 Conn. at 407-08, 696 A.2d at 337 ("In athletic competitions, the object obviously is to win. In games, particularly those *** involving some degree of physical contact, it is reasonable to assume that the competitive spirit of the participants will result in some rules violations and injuries. That is why there are penalty boxes, fouls shots, free kicks, and yellow cards"); *Mark v. Moser*, 746 N.E.2d 410, 419 (Ind. App. 2001).

Policy reasons also justify the holding that rules violations, by themselves, are insufficient to impose liability in a contact sport:

> "[E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (Emphasis in original.) *Knight*, 3 Cal. 4th at 318-19, 834 P.2d at 710, 11 Cal. Rptr. 2d at 16.

At the same time, courts have uniformly recognized that not all misconduct can be considered an inherent aspect of the sport being played. "[S]ome of the restraints of civilization must accompany every athlete on to the playing field." *Nabozny v. Barnhill*, 31 Ill. App. 3d 212, 215 (1975).

Courts have expressed a standard of care that balances these concerns and, in particular, acknowledges the risks inherent in certain sports, in various ways. Perhaps the most frequently cited standard is

-15-

that adopted by the Supreme Court of California in *Knight v. Jewett*, 3 Cal. 4th 296, 834 P.2d 696, 11 Cal. Rptr. 2d 2 (1992). There, the court stated that a participant breaches a duty of care to a coparticipant "only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." *Knight*, 3 Cal. 4th at 320, 834 P.2d at 711, 11 Cal. Rptr. 2d at 17. Other authorities have adopted similar standards. See, *e.g.*, *Turcotte*, 68 N.Y.2d at 441, 502 N.E.2d at 970, 510 N.Y.S.2d at 55 (liability will lie for "flagrant infractions unrelated to the normal method of playing the game and done without any competitive purpose"); *Mark*, 746 N.E.2d at 422 ("liability will not lie where the injury causing action amounts to a tactical move that is an inherent or reasonably foreseeable part of the game and is undertaken to secure a competitive edge"); 17 Marq. Sports L. Rev. at 283 (liability will lie for "extreme conduct that falls squarely outside of the customs or ordinary conduct that can be expected in a particular sport"). Regardless of the precise wording, these standards all draw a line in a way that permits recovery for extreme misconduct during a sporting event that causes injury, while at the same time foreclosing liability for conduct which, although it may amount to an infraction of the rules, is nevertheless an inherent and inevitable part of the sport. We agree with the standards set forth in the above authorities, and conclude that, in a full contact sport such as ice hockey or tackle football, a participant breaches a duty of care to a coparticipant only if the participant intentionally injures the coparticipant or engages in conduct "totally outside the range of the ordinary activity involved in the sport." *Knight*, 3 Cal. 4th at 320, 834 P.2d at 711, 11 Cal. Rptr. 2d at 17.

As currently pled, nothing takes the play at issue in this case totally outside the range of ordinary activity associated with ice hockey in a game in which bodychecking is allowed. The complaint contains no allegation that Benjamin was deliberately targeted by the player defendants, either in retaliation for an earlier incident or some other purpose, or that the player defendants had any intent to hurt him. Although the complaint alleges that Benjamin was struck while next to the boards at the edge of the rink, there is no allegation that body checks are prohibited in that area, or that the body check was in

some way out of the normal area of play. Nor does the complaint allege that plaintiff was struck after play had been stopped.

The key allegation in plaintiff's complaint is that the player defendants violated a rule against checking from behind when they struck Benjamin. However, as noted, rules violations are considered an inherent, unavoidable risk of playing a contact sport. As pled then, plaintiff's complaint fails to allege conduct totally outside the ordinary range of activity associated with ice hockey. The circuit court properly dismissed count I of plaintiff's complaint, and the judgment of the appellate court reinstating that count must be reversed.

This is not to say, however, that conduct totally outside the ordinary range of activity associated with ice hockey did not occur in this case. For example, if Benjamin was struck by the player defendants, not in the heat of play while struggling to gain possession of the puck, but away from the puck and the action of the game, that might well be a breach of the standard adopted here. However, in his complaint, plaintiff does not include any indication of where Benjamin was in relation to the puck, and any ongoing play, when the contact took place. A plaintiff cannot successfully plead a cause of action for conduct which is totally outside the range of ordinary activity involved in the sport without including facts that describe the play that was occurring at the time of injury.

The appellate court below suggested that the defendant players could raise the location of the puck as an issue in rebuttal, to defeat the inference of willful and wanton conduct raised by plaintiff's complaint. 369 Ill. App. 3d at 892. However, this would improperly shift the burden to defendants. It is a plaintiff's responsibility to plead facts that establish a defendant's duty (*Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000)), and thus, in a full-contact sport, it is plaintiff's responsibility to plead facts that show conduct totally outside the range of ordinary activity involved in the sport.

Finally, we acknowledge that the standard of care we adopt today, while necessitated by the underlying rationale of *Pfister*, was not explicitly set forth in that decision. Under these circumstances, to avoid any unfairness to plaintiff, we deem it appropriate to remand this cause to the circuit court with instructions to permit plaintiff to amend count I of his complaint in conformance with the standard of care set forth in this opinion, if he is able to do so.

-17-

Organizational Defendants

Plaintiff's second amended complaint contains three counts, counts II, IV and VI, that allege negligence on the part of the organizational defendants, Redhawk Hockey, the Hockey Association, and the Officials Association. The organizational defendants initially contend that the negligence counts are barred by the contact sports exception and, therefore, that the appellate court erred in reversing the circuit court's dismissal of these counts.

Whether the contact sports exception may be applied to a nonparticipant in a sporting event, such as the organizational defendants here, is an issue of first impression in this court. In considering this issue, both parties direct our attention to the Supreme Court of California's decision in *Kahn v. East Side Union High School District*, 31 Cal. 4th 990, 75 P.3d 30, 4 Cal. Rptr. 3d 103 (2003). In *Kahn*, the plaintiff was a novice member of a high school swim team who broke her neck after diving off a starting block into a shallow racing pool. The plaintiff filed suit against the school district and her swimming coach, alleging that she had been inadequately instructed in how to safely dive into a racing pool and had been pushed beyond her capabilities. The circuit court granted summary judgment in favor of the defendants. The intermediate appellate court affirmed, holding that shallow-water diving presents dangers that are inherent in competitive swimming and that "coaches who merely challenge their students to move beyond their current level of performance have not breached a duty of care." *Kahn*, 31 Cal. 4th at 997-1002, 75 P.3d at 33-37, 4 Cal. Rptr. 3d at 107-12.

On appeal, the Supreme Court of California considered the standard of care that should be applied to the defendants. The court noted that a number of cases had declined to impose liability on a coach or instructor on the basis of ordinary negligence in urging students to go beyond their current level of competence. In these cases, the court noted, the analysis had focused generally on the circumstances of the sport and its inherent risks, the relationship of the parties to the sport and to each other, and "whether imposing broader liability on coaches and instructors would harm the sport or cause it to be changed or abandoned." *Kahn*, 31 Cal. 4th at 1006, 75 P.3d at 39, 4 Cal. Rptr. 3d at 115. Discussing these same criteria, the Supreme Court of California noted that "the risks associated with

*learning* a sport may themselves be inherent risks of the sport, and that an instructor or coach generally does not increase the risk of harm inherent in learning the sport simply by urging the student to strive to excel or to reach a new level of competence." (Emphasis in original.) *Kahn*, 31 Cal. 4th at 1006, 75 P.3d at 40, 4 Cal. Rptr. 3d at 115. The court also noted that "[t]o impose a duty to mitigate the inherent risks of learning a sport by refraining from challenging a student, as these cases explain, could have a chilling effect on the enterprise of teaching and learning skills that are necessary to the sport. At a competitive level, especially, this chilling effect is undesirable." *Kahn*, 31 Cal. 4th at 1007, 75 P.3d at 40, 4 Cal. Rptr. 3d at 115.

The court concluded that an ordinary negligence standard was inappropriate, stating:

> "In the present case, we recognize that the relationship of a sports instructor or coach to a student or athlete is different from the relationship between coparticipants in a sport. But because a significant part of an instructor's or coach's role is to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks, and because the fulfillment of such a role could be improperly chilled by too stringent a standard of potential legal liability, we conclude that the same general standard should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student. A sports instructor may be found to have breached a duty of care to a student or athlete only if the instructor intentionally injures the student or engages in conduct that is reckless in the sense that it is 'totally outside the range of the ordinary activity' (*ibid.*) involved in teaching or coaching the sport." *Kahn*, 31 Cal. 4th at 996, 75 P.3d at 32-33, 4 Cal. Rptr. 3d at 106-07.

Applying that standard of care to the case before it, the Supreme Court of California then concluded that there were material questions of fact as to whether the standard had been breached. Accordingly, the court reversed the lower courts' judgments granting summary

-19-

judgment. *Kahn*, 31 Cal. 4th at 1011-13, 75 P.3d at 43-44, 4 Cal. Rptr. 3d at 119-21. See also *Kavanagh v. Trustees of Boston University*, 440 Mass. 195, 204-06, 795 N.E.2d 1170, 1178-80 (2003) (declining to apply an ordinary negligence to a defendant coach who allegedly caused his player to injure an opposing player).

Although *Kahn* is factually distinguishable from the present case, the general principles which the decision relied upon to determine the standard of care for a nonparticipant are persuasive, consistent with *Pfister*, and applicable here. As the appellate court below noted, plaintiff's essential allegation against all three organizational defendants is that they failed to adequately enforce the rule against bodychecking from behind. 369 Ill. App. 3d at 918. Yet, as noted earlier, rules violations are inevitable in contact sports and are generally considered an inherent risk of playing the game. *Pfister*, 167 Ill. 2d at 427, quoting *Pfister*, 256 Ill. App. 3d at 191-92 (Green, J., dissenting). Further, in an organized contact sport, such as the one at issue here, the enforcement of the rules directly affects the way in which the sport is played. Imposing too strict a standard of liability on the enforcement of those rules would have a chilling effect on vigorous participation in the sport. Finally, as the organizational defendants point out, coaching and officiating decisions involve subjective decisionmaking that often occurs in the middle of a fast moving game. It is difficult to observe all the contact that takes place during an ice hockey game, and it is difficult to imagine activities more prone to secondguessing than coaching and officiating. Applying an ordinary negligence standard to these decisions would open the door to a surfeit of litigation and would impose an unfair burden on organizational defendants such as those in the case at bar. Accordingly, we conclude that, under the facts alleged here, the contact sports exception applies to the organizational defendants. To successfully plead a cause of action for failing to adequately enforce the rules in an organized full-contact sport, plaintiff must allege that the defendant acted with intent to cause the injury or that the defendant engaged in conduct "totally outside the range of the ordinary activity" (*Knight*, 3 Cal. 4th at 320, 834 P.2d at 711, 11 Cal. Rptr. 2d at 17) involved with coaching or officiating the sport.

Because the contact sports exception applies to the organizational defendants, the circuit court properly dismissed counts II, IV, and VI

-20-

of plaintiff's second amended complaint, the counts alleging negligence against the organizational defendants. The appellate court below, however, concluded that the negligence counts could go forward. According to the appellate court, plaintiff had successfully pled willful and wanton conduct on the part of the player defendants and "the contact sports exception does not protect the organizational defendants for their negligence leading to the allegedly willful and wanton conduct." 369 Ill. App. 3d at 916. We disagree.

As discussed above, whether the contact sports exception applies to a nonparticipant defendant is a policy determination that rests on the circumstances of the sport and its inherent risks, the relationship of the parties to the sport and to each other, and whether imposing broader liability on the defendant "would harm the sport or cause it to be changed or abandoned." *Kahn*, 31 Cal. 4th at 1006, 75 P.3d at 39, 4 Cal. Rptr. 3d at 115. Application of the exception is not based, as the appellate court concluded, on whether the defendant's conduct causes a third party to violate a standard of care. The appellate court erred in allowing the negligence counts to proceed. The judgment of the circuit court dismissing counts II, IV, and VI is affirmed.

As currently pled, nothing in counts III, V, or VII of plaintiff's second amended complaint, the counts alleging willful and wanton conduct on the part of the organizational defendants, alleges conduct totally outside the range of ordinary activity involved with coaching or officiating the sport of ice hockey. Plaintiff does not allege that the organizational defendants completely failed to enforce the rule against bodychecking from behind and, indeed, the second amended complaint alleges that all the players in the game at issue were wearing a "stop" warning on the back of their jerseys in an effort to enforce the rule. Moreover, as noted previously, although plaintiff's second amended complaint alleged, in counts III and V, that Redhawk Hockey and the Hockey Association actively encouraged violation of the rule against bodychecking from behind, plaintiff conceded in the circuit court that he could not plead any facts, under Supreme Court Rule 137, to support that conclusory allegation. We conclude, therefore, that the appellate court properly affirmed the circuit court's dismissal of counts III, V, and VII.

However, we again note that the standard of care for the organizational defendants, while consistent with the rationale of

-21-

*Pfister*, was not explicit in that decision. As we concluded with respect to count I, and to avoid any unfairness to plaintiff, we remand this cause to the circuit court with instructions to permit plaintiff to amend counts III, V, and VII of his complaint in conformance with the standard of care set forth in this opinion, if he is able to do so.

Civil Conspiracy

We need not address at length plaintiff's allegation of a civil conspiracy between the Hockey Association and the Officials Association to forgo enforcing the rule against bodychecking from behind. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62 (1994). In this case, the appellate court held that plaintiff successfully pled an unlawful purpose based on the court's previous conclusion that plaintiff had successfully alleged negligence on the part of the Officials Association. As the appellate court stated:

> "As discussed above, plaintiff has successfully alleged that [the Officials Association] may be liable in tort for the allegedly willful and wanton injurious conduct resulting from its negligence in failing to enforce the relevant hockey safety rules. Therefore, to the extent that plaintiff is able to prove that liability, he will be able to prove that the purpose of the agreement he alleges between [the Hockey Association] and [the Officials Association] was tortious, *i.e.*, unlawful." 369 Ill. App. 3d at 920.

We have reversed that portion of the appellate court's judgment which allowed the claims of negligence against the organizational defendants to go forward. It follows, therefore, that the judgment of the appellate court allowing the civil conspiracy count to go forward must be reversed as well. However, as we have instructed the circuit court to permit plaintiff to replead, if possible, wrongful conduct in counts I, III, V, and VII, we deem it appropriate to instruct the circuit court to permit plaintiff to replead count VIII, if he is able to do so.

CONCLUSION

The judgment of the circuit court dismissing plaintiff's complaint in its entirety is affirmed. The judgment of the appellate court is affirmed in part and reversed in part. Counts II, IV, and VI of plaintiff's second amended complaint are dismissed with prejudice. The cause is remanded to the circuit court with instructions to permit plaintiff to amend counts I, III, V, VII, and VIII of his complaint in conformance with the standards of care set forth in this opinion, if he is able to do so.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment affirmed;*
*cause remanded with instructions.*

JUSTICE KILBRIDE, specially concurring:

I agree with the result reached by the majority, and I do not generally quarrel with the majority's adoption of the standards announced in *Knight* and *Kahn*. Nonetheless, I believe the majority goes too far when it holds that, under *Knight*, participants in full-contact sports may consciously disregard the safety of their co-participants. I cannot countenance the notion that a participant in any civilized activity may consciously disregard the safety of another without consequence. Furthermore, I believe the majority has not sufficiently explained the scope of liability incurred by youth sport coaches and sporting organizations under *Kahn*. Therefore, I specially concur in the result reached by the majority but not in its reasoning.

The majority contends that "[i]n full-contact sports such as tackle football, and ice hockey where bodychecking is permitted, a conscious disregard for the safety of the opposing player is an inherent part of the game." Slip op. at 13. Therefore, keeping the *Pfister* contact sports exception would produce a chilling effect, and "the games of ice hockey and football as we know them would not be played." Slip op. at 14. They further suggest that it would be unfair to defendants playing full-contact sports to hold them liable for conduct inherent in their sport. Slip op. at 14. Hence, the majority claims that full-contact

-23-

sports require a new and different standard of care to address adequately the aggressiveness and physicality involved, namely, *Knight*'s duty to avoid conduct totally outside the normal range of activity in the sport. Slip op. at 16. I, however, disagree.

To begin, I disagree with the conclusion that a conscious disregard for the safety of opposing players is inherent in full-contact sports. The majority supports this conclusion by noting that some risk of injury is involved when one player strikes another, even within the rules of a sport. Slip op. at 13. While this is undoubtedly true, proper bodychecking or tackling does not necessarily disregard the opponent's "safety." In organized hockey, football, and lacrosse, for example, the rules mandate a wide variety of protective equipment, including helmets and pads, to reduce the risk of injury. Similarly, the rules addressing players' physical contact are designed to shield sensitive and unprotected areas of the body. Notably, blows to the head are prohibited in all three sports. Moreover, through social disapproval, participants in full-contact sports discourage play likely to cause significant injury. Indeed, to be known as a "cheap shot artist" is a significant source of shame for most participants. Therefore, when participants collide in the normal course of play, both reasonably expect they will get up and continue the game. It is fair to say that even in boxing, the most extreme sports example, both boxers expect to shake hands after the bout with no greater injuries than cuts and bruises despite having forcefully struck each other in the face and midsection.

Further, any risk of injury presented by the kind of physical contact the majority describes is by no means unique to full-contact sports. Defensive basketball players regularly take charges from others driving to the basket with a running start. Basketball players may also collide while pursuing rebounds, sometimes known as "banging under the boards." Soccer players sometimes miss while attempting to hit the ball with their heads and, instead, slam into the head of an opponent also competing for the ball. In that same sport, devastating knee injuries occur based on ill-timed, sliding tackles from behind. See also *Kahn*, 31 Cal. 4th at 1003, 75 P.3d at 37, 4 Cal. Rptr. 3d at 112 ("In a game of *touch* football *** there is an inherent risk that players will collide" (emphasis added)).

Therefore, I fail to see why full-contact sports require any special legal treatment. In fact, contrary to the majority's conclusion, we previously suggested that the contact sports exception in *Pfister* would adequately address full-contact sports. The majority even quotes the pertinent portion in its own analysis:

> " 'Those who participate in soccer, *football*, softball, basketball, or even a spontaneous game of can kicking, choose to play *games in which physical contact among participants is inherent in the conduct of the game*. Participants in such games assume a greater risk of injury resulting from the negligent conduct of coparticipants. ***
>
>          * * *
>
> *** The contact sports exception allows recovery for injuries resulting from willful and wanton and intentional misconduct while taking into account the voluntary nature of participation *in games where physical contact is anticipated and where the risk of injury caused by this contact is inherent*.' " (Emphases added.) Slip op. at 10, quoting *Pfister*, 167 Ill. 2d at 426-27.

Instead of replacing the willful and wanton standard in full-contact sports, I believe the *Knight* standard merely further explains willful and wanton behavior and the conscious disregard of a co-participant's safety. *Pfister* also supports this conclusion.

When compared side-by-side, the language in *Knight* and *Pfister* is substantively indistinguishable. As the majority points out, *Pfister* defined willful and wanton conduct "as 'a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety or property of others.' " Slip op. at 12, quoting *Pfister*, 167 Ill. 2d at 421. Similarly, *Knight* imposes liability on a contact sport participant where "the participant intentionally injures another player *or engages in conduct that is so reckless* as to be totally outside the range of the ordinary activity involved in the sport." (Emphasis added.) *Knight*, 3 Cal. 4th at 320, 834 P.2d at 711, 11 Cal. Rptr. 2d at 17. See also *Kahn*, 31 Cal. 4th at 996, 75 P.3d at 32-33, 4 Cal. Rptr. 3d at 106-07 ("A sports instructor may be found to have breached a duty of care to a

student or athlete only if the instructor intentionally injures the student or engages in *conduct that is reckless* in the sense that it is 'totally outside the range of the ordinary activity' *** involved in teaching or coaching the sport" (emphasis added)).

Recklessness, the standard actually used in *Knight*, is synonymous with willful and wanton and encompasses conscious disregard for the safety of another. As Professor Dobbs explains:

"Courts often recognize a kind of *** category of fault that is distinguishable both from intent and from negligence. This category is called recklessness or willful or wanton misconduct. ***

*** [C]ourts find conduct to be reckless, willful or wanton when two elements concur. First, the conduct must not only create an unreasonable risk of harm to others, it must create a high degree of risk or a risk of very serious harm. Second, the defendant *must be conscious of the risk and proceed without concern for the safety of others*." (Emphasis added.) 1 D. Dobbs, Torts §27, at 51 (2001).

In essence, *Knight* does not create a different standard than *Pfister*.

I disagree with the majority's conclusion that adopting the *Knight* standard heralds a new standard of care permitting participants in full-contact sports to disregard consciously the safety of other participants. Rather, this court should affirm the vitality of *Pfister* in all contact sports and merely explain its application in full-contact sports. Therefore, I respectfully concur in the majority opinion because, while I agree with the result reached, I cannot agree with its rationale.

I also respectfully seek to clarify the majority's analysis of the duty properly attributed to youth sports coaches and sporting organizations. The age and experience of the participants must play a role in considering the duty owed by adult coaches and adult-organized sporting organizations. Relying on *Kahn*, the majority adopts a standard of care to be applied to coaches and sporting organizations without specifically addressing these critical factors.

Although *Kahn* involved a young, novice sport participant allegedly hurt due to inadequate instruction from her adult, high school coach, the *Kahn* majority did not expressly consider how a

-26-

participant's age and experience would affect the coach's duty. In fact, the two justices of the California Supreme Court who wrote separately in *Kahn* criticized the inflexibility of the rule created by the majority as failing to account for the age and skill level of the participants and coaches. In his special concurrence, Justice Werdegar stated his belief that coaches and teachers of minor students should bear "a somewhat greater duty." *Kahn*, 31 Cal. 4th at 1019, 75 P.3d at 49, 4 Cal. Rptr. 3d at 126 (Werdegar, J., specially concurring). He further noted:

> "When the instructor or coach is a school teacher *** the safety of the minor students will usually be a primary consideration. Society expects-legitimately, in my view-more from instructors and coaches than merely that they will refrain from harming a student intentionally or with wanton disregard for safety. An instructor's gross or extreme lack of care for student safety is not an inherent risk of school athletics programs." *Kahn*, 31 Cal. 4th at 1019-20, 75 P.3d at 49, 4 Cal. Rptr. 3d at 126 (Werdegar, J., specially concurring).

Similarly, Justice Kennard observed in his dissent:

> "[T]he majority adopts the same standard for a professional coach of *novice teenage athletes* that the *Knight* and *Ford* plurality found appropriate for *participants* in active sports. Not taken into account by the majority is the significant difference between the two groups. *** Because student athletes, particularly minors, often consider their coach a mentor or role model, they trust the coach not to carelessly and needlessly expose them to injury." (Emphases in original.) *Kahn*, 31 Cal. 4th at 1023, 75 P.3d at 52, 4 Cal. Rptr. 3d at 129-30 (Kennard, J., concurring in part and dissenting in part).

Perhaps to avoid these pitfalls, the majority here cites those portions of the *Kahn* majority opinion noting the relationship of the parties to each other, and to the sport, in assessing whether a coach or sporting organization has acted totally outside of the range of ordinary coaching or instruction. Slip op. at 18-20. Although the majority does not expressly discuss the significant factors of youth and inexperience, this acknowledgment suggests it intends to require a higher standard of care for coaches and organizations with young, inexperienced participants. This higher standard of care will be

triggered by the nature of the relationships among these players and their coaches and organizations. The pertinent question in determining whether a coach or organization acted willfully and wantonly will be whether the action of the coaches or the sporting organizations was totally outside of the range of the ordinary coaching, instruction, supervision, or organization of players of a certain age and experience level in a particular sport. With that addition, the *Kahn* framework as presented by this majority is sufficient. If this is not the majority's intent, however, it should be. We cannot legitimately ignore younger athletes' greater physical vulnerability or their limited autonomy from their coaches and sporting organizations in assessing the propriety of their conduct toward their young athletes.

To the extent that the majority departs from this interpretation of the full-contact sports standard in *Knight* and the application of *Kahn* in the context of youth sports, I respectfully concur in the majority's judgment but not in its reasoning.